**ALMONT AMBULATORY SURGERY CENTER, LLC, et al.**

v.

**UNITEDHEALTH GROUP, INC., et al.**

**Case No. CV 14-3053-MWF(VBKx)**

United States District Court,
C.D. California.

Signed February 12, 2015

954

Daron L. Tooch, Eric David Chan, Bridget A. Gordon, Katherine Markowski Dru, Hooper Lundy and Bookman PC, Bryan David Daly, Charles L. Kreindler, Sheppard Mullin Richtera and Hampton LLP, Los Angeles, CA, for Almont Ambulatory Surgery Center, LLC, et al.

Larry A. Walraven, Nicole Elizabeth Wurscher, Bryan Scott Westerfeld, Walraven and Westerfeld LLP, Aliso Viejo, CA, Andrew J. Holly, Kirsten Schubert, Michael E. Rowe, Michelle S. Grant, Rabea Jamal Zayed, Stephen P. Lucke, Timothy E. Branson, Dorsey and Whitney LLP, Minneapolis, MN, for UnitedHealth Group, Inc., et al.

**Proceedings (In Chambers): ORDER GRANTING IN PART AND DENYING IN PART PROVIDER COUNTER-DEFENDANTS' MOTION TO DISMISS THE FIRST AMENDED COUNTERCLAIM AND JOINDER IN COUNTER-DEFENDANTS MICHAEL OMIDI, M.D. AND JULIAN OMIDI'S MOTION TO DISMISS FIRST AMENDED COUNTERCLAIM [48]**

MICHAEL W. FITZGERALD, U.S. District Judge

This matter is before the Court on Provider Counter-Defendants' ("Providers") Motion to Dismiss the First Amended Counterclaim and Joinder in Counter-Defendants Michael Omidi, M.D. and Julian Omidi's Motion to Dismiss First Amended Counterclaim (the "Motion"). (Docket No. 48). The Court read and considered the papers on the Motion, and held a hearing on December 10, 2014. For the reasons stated below, the Court **GRANTS IN PART** and **DENIES IN PART** the Motion.

## I. BACKGROUND

On March 21, 2014, Plaintiffs initiated this action by filing a Complaint in the Los Angeles Superior Court. (Docket No. 1; Notice of Removal, Ex. A). On April 21, 2014, Defendants (collectively, "United") removed this action to this Court. (*Id.*). The Complaint asserts claims for violation of the California Business and Professions Code section 17200 *et seq.* (the "UCL"), breach of implied-in-fact contracts, services rendered, estoppel, and declaratory relief. (*Id.*).

United asserted federal subject matter jurisdiction on the basis that the state law claims alleged in the Complaint are completely preempted by the Employee Retirement Income Security Act ("ERISA"). (Docket No. 1, Notice of Removal ¶¶ 5–17). On May 15, 2014, the Court issued an Order to Show Cause Re: Jurisdiction (the "OSC") (Docket No. 27), to which the parties responded on June 5, 2014 (Docket Nos. 34, 35). The Court then issued an Order Discharging the OSC on June 16, 2014 (Docket No. 38), in which the Court exercised its own judgment and agreed with the parties' reasoning that the Complaint's claim for declaratory relief was completely preempted by ERISA, thereby conferring federal jurisdiction over the action.

On May 15, 2014, United filed a Counterclaim (Docket No. 25), adding several Counterclaim Defendants to the litigation, including Dr. Michael Omidi and Kambiz Benjamin Omidi a.k.a. Julian Omidi. The Providers responded by filing a Motion to Dismiss the Counterclaim on July 7, 2014. (Docket No. 39). However, the parties entered into a stipulation (Docket No. 43) to withdraw pending motions to dismiss the Counterclaim and a pending motion to strike portions of the Counterclaim. The Court granted this stipulation and set deadlines for a First Amended Counter-claim ("FACC"), and answers or motions to dismiss in response thereto. (Docket No. 44).

On September 3, 2014, United filed a FACC. (Docket No. 45). The FACC asserts claims for fraud, violation of the UCL, conspiracy to commit fraud, intentional interference with contractual relationships, restitution under ERISA § 502(a)(3), and declaratory and injunctive relief under ERISA § 502(a)(3). (Docket No. 45). The FACC alleges that Counterclaim Defendants are conspiring to defraud the public and United out of millions of dollars. (FACC ¶ 62). This conspiracy is purportedly hidden through the use of sham/shifting business names. (*Id.* ¶ 126). The activities underlying the conspiracy are generally alleged to be "various fraudulent practices designed to manipulate United to pay for services that were not medically necessary, never provided, or not covered by the terms of the United Plans." (*Id.* ¶ 68). The specific malfeasance alleged includes: inducing patients to receive Lap–Band–related treatment through, among other things, improperly waiving copay, coinsurance, deductibles amounts (collectively, "co-pay") (*id.* ¶ 66); mischaracterizing Lap–Band procedures provided by billing under incorrect CPT codes, hiding services that would not have otherwise been covered, or misrepresenting patients' BMI calculations (*id.* ¶ 68); and submitting inflated bills to United in an attempt to induce United to allow payment in excess of UCR (*id.* ¶ 275).

On October 3, 2014, the Providers filed this Motion. On October 31, 2014, United filed an Opposition to Providers' Motion to Dismiss the FACC (the "Opposition"). (Docket No. 65). On November 14, 2014, the Providers filed a Reply in Support of the Motion (the "Reply"). (Docket No. 78).

## II. *MOTION TO DISMISS*

Providers' bring the Motion pursuant to Federal Rules of Civil Procedure 9(b), 12(b)(1) and 12(b)(6).

In ruling on a motion under Federal Rule of Civil Procedure 12(b)(6), the Court follows *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007), and *Ashcroft v. Iqbal*, 556 U.S. 662, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Iqbal*, 556 U.S. at 678, 129 S.Ct. 1937 (citations omitted). "'All allegations of material fact in the complaint are taken as true and construed in the light most favorable to the plaintiff.'" *Williams v. Gerber Prods. Co.*, 552 F.3d 934, 937 (9th Cir.2008) (quoting *Stoner v. Santa Clara County Office of Educ.*, 502 F.3d 1116, 1120 (9th Cir.2007) (holding that a plaintiff had plausibly stated that a label referring to a product containing no fruit juice as "fruit juice snacks" may be misleading to a reasonable consumer).

Federal Rule of Civil Procedure 9(b) requires that "a party [alleging fraud] must state with particularity the circumstances constituting fraud." To satisfy Rule 9(b), a plaintiff must include "the who, what, when, where, and how" of the fraud. *Vess v. Ciba–Geigy Corp. USA*, 317 F.3d 1097, 1106 (9th Cir.2003) (internal quotation marks and citations omitted). "A motion to dismiss a complaint or claim 'grounded in fraud' under Rule 9(b) for failure to plead with particularity is the functional equivalent of a motion to dismiss under Rule 12(b)(6) for failure to state a claim." *Id.* at 1107. As such, dismissals under Rule 9(b) and 12(b)(6) "are treated in the same manner." *Id.* at 1107–08.

In ruling on a motion under Federal Rule of Civil Procedure 12(b)(1), the Court must determine whether it lacks subject matter jurisdiction over the Complaint or any claims therein. "A jurisdictional challenge under Rule 12(b)(1) may be made either on the face of the pleadings or by presenting extrinsic evidence." *Warren v. Fox Family Worldwide, Inc.*, 328 F.3d 1136, 1139 (9th Cir.2003) (citing *White v. Lee*, 227 F.3d 1214, 1242 (9th Cir.2000)) (evaluating whether a composer had standing to pursue copyright claims against a producer and distributors).

### A. *Disclosure of Parties in Interest*

Although Providers point out that United did not initially supply a thorough Notice of Interested Parties, this oversight has been corrected, as mentioned in the Opposition (Opp. at 2) and reflected in Docket No. 64.

### B. *United's Standing*

#### 1. United's Standing Under ERISA

United asserts two claims pursuant to ERISA § 502(a)(3). (FACC ¶¶ 316–43). Only plan participants, beneficiaries, and fiduciaries are afforded standing to bring an ERISA § 502(a)(3) claim. 29 U.S.C. § 1132(a)(3).

Providers contend that United does not plead relevant terms from the vast majority of plans that provide it with fiduciary status, and that standing here requires a plan-by-plan analysis. (Mot. at 3–4). Moreover, Providers argue that the few allegations that are pleaded are inadequate because United relies on summary plan descriptions ("SPDs") and administrative services agreements ("ASAs") to support its standing as a plan fiduciary, which are insufficient as they are not the operative plan documents. (*Id.* at 2–6). United, however, argues that it provided examples from plan documents, not SPDs, and ASAs that demonstrate United's fiduciary au-

thority, and, therefore, standing. (Opp. at 2–3).

■ As mentioned above, ERISA § 502(a)(3) permits a plan fiduciary to bring suit to enjoin activities that violate ERISA or the terms of the plan, or receive appropriate equitable relief to redress violations of or enforce the terms of ERISA or the plan. 29 U.S.C. § 1132(a)(3). "A 'fiduciary' is an entity with 'any discretionary authority' in the 'administration of' an ERISA plan." *Saffon v. Wells Fargo & Co. Long Term Disability Plan*, 522 F.3d 863, 866 (9th Cir.2008) (citing 29 U.S.C. § 1002(21)(A)); *see also Moore v. Lafayette Life Ins. Co.*, 458 F.3d 416, 438 (6th Cir.2006) ("Under ERISA a person is a fiduciary only with respect to those aspects of the plan over which he or she exercises authority or control."). A "person who performs purely ministerial functions ... for an employee benefit plan within a framework of policies, interpretations, rules, practices and procedures made by other persons is not a fiduciary because such person does not have discretionary authority or discretionary control respecting management of the plan...." 29 C.F.R. § 2509.75-8(D-2). However, "an insurer will be found to be an ERISA fiduciary if it has the authority to grant, deny, or review denied claims." *Kyle Rys., Inc. v. Pac. Admin. Servs., Inc.*, 990 F.2d 513, 518 (9th Cir.1993).

■ Here, United has alleged that "[f]or all (or virtually all) of the ERISA Plans, one of the United Counterclaimants in this matter has been delegated by the respective plan's Plan Administrator the fiduciary responsibility and discretion to decide claims under the terms of the Plan ('Claims Administrator.')." (FACC ¶ 318). The FACC further alleges that, in these instances, "the Plan document in question will delegate to a United Counterclaimant discretionary authority to resolve partici-

pants' claims for benefits under the Plan. United's authority to decide claims is final and binding, subject only to judicial review (or independent external review mandated by state law or the Affordable Care Act)." (*Id.*). The FACC goes on to provide exemplar language from the Whole Foods Market Group Benefit Plan and ASA, Time Warner Plan document, and the ASA with AOL Time Warner that demonstrate the discretion and duties afforded to a United entity under the plans. (*Id.* ¶¶ 319–24). The FACC, moreover, alleges that "[t]hese, or materially indistinguishable, terms are included in the Plan documents and ASAs for all (or virtually all) of the ERISA Plans included in Appendix I." (*Id.* ¶ 325). These allegations are sufficient at the present stage of the litigation to establish standing as a fiduciary under ERISA § 502(a)(3).

Providers' contentions that the example language from these plans is unavailing because it is taken from SPDs rather that actual plan documents is contradicted by the plain wording of the FACC. (*See, e.g., id.* ¶ 322) ("The [Time Warner] Plan document in question delegates to United-Healthcare Insurance Company the discretionary authority to resolve all claims for benefits under the terms of the plan.").

Providers continually refer to plans, on whose behalf United does not seek to recoup payments, as containing language that does not confer the same discretion. (*See* Mot. at 5–6). However, the very fact that the FACC does not seek to recoup for plans which purportedly contain differing language undercuts Providers' argument that such plans defeat United's fiduciary standing here. To the extent that Providers are contending that United is not a fiduciary for plans that it names as relevant in the related *Almont* case, however, this allegation, if proven, could have repercussions for its breach of fiduciary duty

claims in that case. (*See id.* at 6 ("For example, Walmart's SPD simply describes United as a Third Party Administrator that does not have fiduciary responsibility. (Declaration of Eric Chan Supp. Mot. Dismiss FACC ('Chan Decl.') Ex. A, p. 43 & 239.) It is likely for this reason that Appendix A to the FACC lists no Walmart claims for which United seeks to recoup payments, though Walmart is a party to the main Almont action.")). Moreover, Providers' argument that some plans, which are not at issue in the FACC, do not confer fiduciary responsibility is based on SPDs; however, Providers have already argued that SPDs are insufficient to reflect plan terms. (Mot. at 4–5 ("[C]ourts regularly decline to accept representations made in the language of an SPD as to the discretion that a plan document has delegated to a third party administrator.")).

Finally, Providers' argument that United's status as a claims administrator is insufficient to confer fiduciary status is unavailing. Providers cite to authority stating that if an entity merely provides ministerial tasks, it is not a fiduciary for ERISA purposes. (Mot. at 6). However, United has not alleged that it merely carries out the directives of another entity. Rather, United alleges that it has "been delegated by the respective plan's Plan Administrator the fiduciary responsibility and discretion to decide claims." (FACC ¶ 318). This discretion is the hallmark of an ERISA fiduciary, and United, consequently has standing to bring suit under § 502(a)(3).

### 2. United's Article III Standing

Providers contend that United has not alleged that it suffered any loss in connection with the claims that are related to self-funded ERISA plans, and therefore there have been insufficient allegations to support Article III standing for claims brought on behalf of these plans. (Mot. at 6–7). As discussed above, with respect to the ERISA claims asserted on behalf of self-funded plans, United has properly alleged that it is a fiduciary of the self-funded plans and is acting on behalf of the plans, pursuant to its fiduciary obligations, to recover overpayments and enforce the terms of the plans. (*See, e.g.,* FACC ¶¶ 323–26).

A plaintiff must have Article III standing in order for the suit to constitute a "case or controversy" over which a federal court has subject matter jurisdiction. *Cetacean Cmty. v. Bush,* 386 F.3d 1169, 1174 (9th Cir.2004) (citing *Steel Co. v. Citizens for a Better Env't,* 523 U.S. 83, 101, 118 S.Ct. 1003, 140 L.Ed.2d 210 (1998)). In order to demonstrate Article III standing, a plaintiff must show: "(1) injury in fact; (2) causation; and (3) likelihood that a favorable decision will redress the injury." *Schneider v. Chertoff,* 450 F.3d 944, 959 (9th Cir.2006) (citing *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992)). An "injury in fact" consists of "an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical." *Lujan,* 504 U.S. at 560, 112 S.Ct. 2130 (internal quotation marks and citations omitted). General allegations regarding injury are sufficient at the pleading stage. *Braunstein v. Arizona Dept. of Transp,* 683 F.3d 1177, 1184 (9th Cir.2012) (citing *Lujan,* 504 U.S. at 561, 112 S.Ct. 2130).

"Because 'ERISA abounds with the language and terminology of trust law,' the Court relies heavily on trust law doctrine in interpreting ERISA." *Gabriel v. Alaska Elec. Pension Fund,* 773 F.3d 945, 954 (9th Cir.2014) (quoting *Firestone Tire & Rubber Co. v. Bruch,* 489 U.S. 101, 110, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989)). For example, in evaluating the appropriate standard of review for benefit decisions,

the Supreme Court has previously analogized a plan administrator to a trustee of a common law trust. *See Metro. Life Ins. Co. v. Glenn,* 554 U.S. 105, 111, 128 S.Ct. 2343, 171 L.Ed.2d 299 (2008). Moreover, the Supreme Court has noted that ERISA typically treats a plan fiduciary as a trustee. *CIGNA Corp. v. Amara,* 563 U.S. 421, 131 S.Ct. 1866, 1879, 179 L.Ed.2d 843 (2011) (stating that ERISA typically treats the terms of a plan as a trust and a plan fiduciary as a trustee). In *Sprint Communications Co., L.P. v. APCC Services, Inc.,* the Supreme Court discussed Article III standing in the context of assignments, and pointed out that "federal courts routinely entertain suits which will result in relief for parties that are not themselves directly bringing suit," using trustees initiating suit on behalf of a trust as just such an example. 554 U.S. 269, 287, 128 S.Ct. 2531, 171 L.Ed.2d 424 (2008). The Ninth Circuit, likewise, has noted that trustees and executors have Article III standing because they "have a stake in the litigation because they are acting on behalf of the estate, which owns the claims being litigated." *Glanton ex rel. ALCOA Prescription Drug Plan v. AdvancePCS Inc.,* 465 F.3d 1123, 1126 (9th Cir.2006).

■ In light of Supreme Court precedent, as well as the Ninth Circuit's guidance regarding trust law, United has made an adequate showing of constitutional standing as to self-funded plans. Moreover, Providers do not contest United's standing to assert claims on behalf of fully-insured plans, and, in any event, Article III standing is manifest as to these plans, for which United purportedly served as both claims administrator and insurer. (FACC ¶ 51).

### 3. United's Standing to Bring a UCL Claim

Providers do not contest United's standing to bring a UCL claim on behalf of any fully-insured plans at issue, and, in much in the same way that Article III standing is evident for these plans, so too is standing for purposes of a UCL claim. However, Providers argue that United lacks standing to bring a UCL claim on behalf of self-funded plans because the plans themselves are financially responsible for benefit claims, and United has failed to allege that it has suffered any economic injury. (Mot. at 8).

■ Previously, the UCL afforded standing for "any person acting for the interests of itself, its members or the general public." *Kwikset Corp. v. Superior Court ("Kwikset"),* 51 Cal.4th 310, 320, 120 Cal.Rptr.3d 741, 246 P.3d 877 (2011) (internal quotation marks and citations omitted). However, in 2004, with the enactment of Proposition 64, UCL standing requirements became more stringent. *Id.* at 320–21, 120 Cal.Rptr.3d 741, 246 P.3d 877. The California Supreme Court has noted that the purpose of this change was "to eliminate standing for those who have not engaged in any business dealings with would-be defendants and thereby strip such unaffected parties of the ability to file 'shakedown lawsuits,' while preserving for actual victims of deception and other acts of unfair competition the ability to sue and enjoin such practices." *Id.* at 317, 120 Cal.Rptr.3d 741, 246 P.3d 877 (citations omitted). "To have standing under California's UCL, as amended by California's Proposition 64, plaintiffs must establish that they (1) suffered an injury in fact and (2) lost money or property as a result of the unfair competition." *Birdsong v. Apple, Inc.,* 590 F.3d 955, 959 (9th Cir.2009) (citing Cal. Bus. & Prof. Code § 17204; *Walker v. Geico Gen. Ins. Co.,* 558 F.3d 1025, 1027 (9th Cir.2009)) (discussing, in case involving consumer suit alleging that Apple's iPod was defective because it

posed an unreasonable risk of noise-induced hearing loss, that consumers lacked standing under the UCL because they failed to show the requisite injury to themselves).

■ The "injury in fact" element of UCL standing is meant to incorporate the "established federal meaning," which was already discussed above in the context of Article III standing. *Kwikset*, 51 Cal.4th at 322, 120 Cal.Rptr.3d 741, 246 P.3d 877. In many cases, satisfaction of the "lost money or property" element will satisfy this "injury in fact" requirement. *Id.* at 323, 120 Cal.Rptr.3d 741, 246 P.3d 877. In its own right, the "lost money or property" element can be satisfied in "innumerable" ways, such as when a plaintiff is made to: "(1) surrender in a transaction more, or acquire in a transaction less, than he or she otherwise would have; (2) have a present or future property interest diminished; (3) be deprived of money or property to which he or she has a cognizable claim; or (4) be required to enter into a transaction, costing money or property, that would otherwise have been unnecessary." *Id.* The California Supreme Court has recognized that the economic component of UCL standing renders it more restrictive than federal injury in fact (because it includes fewer types of injury), but also notes that the actual quantum of economic injury needed is only as much as would satisfy injury in fact—all that need be alleged is an "identifiable trifle" of injury. *Id.* at 324–25, 120 Cal.Rptr.3d 741, 246 P.3d 877 (internal quotation marks and citations omitted).

Here, it does stand to reason that United, as the entity purportedly subject to fraudulent misrepresentations made by Providers, should be permitted to redress the harms stemming from these alleged practices. Moreover, United does not run afoul of *Kwikset's* pronouncement that

Proposition 64 was meant to "eliminate standing for those who have not engaged in any business dealings with would-be defendants."

■ However, it is unclear what economic injury United has suffered in connection with self-funded plans as a result of Providers' purported conduct. Absent a showing of such injury, the UCL standing requirements do not permit United to bring suit. The Court, therefore, concludes that United does not have standing to bring a UCL claim on behalf of the self-insured plans.

### C. *United's State Law Claims*
#### 1. ERISA Preemption

Providers argue that United's state law claims seeking recoupment on behalf of ERISA plans are preempted. (Mot. at 9–12). United asserts claims on behalf of non-ERISA plans as well as ERISA plans. (FACC ¶ 51). State law claims brought on behalf of non-ERISA plans would not be preempted irrespective of this analysis, so the following discussion is only relevant to the claims as applied to ERISA plans.

"There are two strands of ERISA preemption: (1) 'express' preemption under ERISA § 514(a), 29 U.S.C. § 1144(a); and (2) preemption due to a 'conflict' with ERISA's exclusive remedial scheme set forth in 29 U.S.C. § 1132(a), notwithstanding the lack of express preemption." *Paulsen v. CNF Inc.*, 559 F.3d 1061, 1081 (9th Cir.2009) (citing *Cleghorn v. Blue Shield of Cal.*, 408 F.3d 1222, 1225 (9th Cir.2005)). The Court will discuss each in turn.

#### a. "Express" Preemption Under § 514(a)

■ "Express" preemption, unlike "complete preemption," does not confer federal question removal jurisdiction. *See Marin Gen. Hosp. v. Modesto & Empire*

*Traction Co. ("Marin General")*, 581 F.3d 941, 945–46 (9th Cir.2009). Express preemption is governed by ERISA § 514(a), which "provides that, subject to various exceptions ..., ERISA 'supersede[s] any and all State laws insofar as they may ... relate to any employee benefit plan.'" *Sarkisyan v. CIGNA Healthcare of California, Inc.*, 613 F.Supp.2d 1199, 1203 (C.D.Cal.2009) (quoting 29 U.S.C. § 1144(a)). "A law 'relates to' an employee benefit plan, in the normal sense of the phrase, if it has a connection with or reference to such a plan." *Shaw v. Delta Air Lines, Inc.*, 463 U.S. 85, 96–97, 103 S.Ct. 2890, 77 L.Ed.2d 490 (1983). The Supreme Court has noted that this "preemption clause is conspicuous for its breadth," as "[i]t establishes as an area of exclusive federal concern the subject of every state law that 'relate[s] to' an employee benefit plan governed by ERISA." *FMC Corp. v. Holliday*, 498 U.S. 52, 58, 111 S.Ct. 403, 112 L.Ed.2d 356 (1990). Even state laws that are consistent with ERISA are preempted. *See Metro. Life Ins. Co. v. Massachusetts*, 471 U.S. 724, 739, 105 S.Ct. 2380, 85 L.Ed.2d 728 (1985).

■ A state law demonstrates the forbidden "reference to" an ERISA plan when it "acts immediately and exclusively upon ERISA plans ... or where the existence of ERISA plans is essential to the law's operation." *California Div. of Labor Standards Enforcement v. Dillingham Const., N.A., Inc.*, 519 U.S. 316, 325, 117 S.Ct. 832, 136 L.Ed.2d 791 (1997) (finding that a California law requiring a contractor on a public works project to pay its workers the prevailing wage in the project's locale had no "reference to" ERISA plans).

A state law that does not "refer to" an ERISA plan could, nevertheless, be preempted if has a "connection with" such a plan. *Id.* at 325, 117 S.Ct. 832. Previously, the Supreme Court interpreted "re-lates to," and consequently "connection with," broadly. *See, e.g., Shaw*, 463 U.S. at 97, 103 S.Ct. 2890. However, more recently, the Supreme Court has limited the scope of this analysis. *See Operating Eng'rs Health & Welfare Trust Fund v. JWJ Contracting Co.*, 135 F.3d 671, 677 (9th Cir.1998) ("Of late, the [Supreme] Court has come to recognize that ERISA pre-emption must have limits when it enters areas traditionally left to state regulation....."). In *New York State Conference of Blue Cross & Blue Shield Plans v. Travelers Insurance. Co. ("Travelers")*, 514 U.S. 645, 656, 115 S.Ct. 1671 (1995), the Supreme Court recognized that "[f]or the same reasons that infinite relations cannot be the measure of pre-emption, neither can infinite connections." As such, under the more modern approach, a § 514(a) "connection with" analysis requires "look[ing] both to 'the objectives of the ERISA statute as a guide to the scope of the state law that Congress understood would survive,' as well as to the nature of the effect of the state law on ERISA plans." *California Div. of Labor Standards Enforcement*, 519 U.S. at 325, 117 S.Ct. 832 (quoting *Travelers*, 514 U.S. at 656, 658–59, 115 S.Ct. 1671).

Regarding the objectives of ERISA, the Supreme Court has stated that Congress's intent in passing § 514(a) was:

[T]o ensure that plans and plan sponsors would be subject to a uniform body of benefits law; the goal was to minimize the administrative and financial burden of complying with conflicting directives among States or between States and the Federal Government. Otherwise, the inefficiencies created could work to the detriment of plan beneficiaries.

*Ingersoll–Rand Co. v. McClendon*, 498 U.S. 133, 142, 111 S.Ct. 478, 112 L.Ed.2d 474 (1990) (citing *FMC Corp. v. Holliday*,

498 U.S. 52, 60, 111 S.Ct. 403, 112 L.Ed.2d 356 (1990)).

■ In contrast, the Supreme Court "has established a presumption that Congress did not intend ERISA to preempt areas of 'traditional state regulation' that are 'quite remote from the areas with which ERISA is expressly concerned—reporting, disclosure, fiduciary responsibility, and the like.'" *Paulsen v. CNF Inc.*, 559 F.3d 1061, 1082 (9th Cir.2009) (quoting *Rutledge v. Seyfarth, Shaw, Fairweather & Geraldson,* 201 F.3d 1212, 1216 (9th Cir.2000), *opinion amended on denial of reh'g,* 208 F.3d 1170 (9th Cir.2000)) (internal quotation marks omitted). Should a state law have "only a tenuous, remote, or peripheral connection with covered plans, as is the case with many laws of general applicability," preemption does not occur. *Travelers,* 514 U.S. at 661, 115 S.Ct. 1671 (quoting *District of Columbia v. Greater Washington Bd. of Trade,* 506 U.S. 125, 130 n. 1, 113 S.Ct. 580, 121 L.Ed.2d 513 (1992)) (internal quotation marks omitted).

The Ninth Circuit has utilized a "relationship test" in evaluating "connection with" preemption, which entails a finding that "a state law claim is preempted when the claim bears on an ERISA-regulated relationship, *e.g.,* the relationship between plan and plan member, between plan and employer, between employer and employee." *Paulsen,* 559 F.3d at 1082 (citing *Providence Health Plan v. McDowell,* 385 F.3d 1168, 1172 (9th Cir.2004)).

### b. "Complete" Preemption under § 502(a)

■ Complete preemption demonstrates that the remedial scheme of 502(a) is to be "'the exclusive vehicle for actions by ERISA-plan participants and beneficiaries asserting improper processing of a claim for benefits.'" *Kanne v. Connecticut Gen. Life Ins. Co.,* 867 F.2d 489, 494 (9th Cir.1988) (quoting *Pilot Life Ins. Co.*

*v. Dedeaux,* 481 U.S. 41, 52, 107 S.Ct. 1549, 95 L.Ed.2d 39 (1987)).

■ "Complete preemption under § 502(a) is 'really a jurisdictional rather than a preemption doctrine, [as it] confers exclusive federal jurisdiction in certain instances where Congress intended the scope of a federal law to be so broad as to entirely replace any state-law claim.'" *Marin General,* 581 F.3d at 945 (quoting *Franciscan Skemp Healthcare, Inc. v. Cent. States Joint Bd. Health & Welfare Trust Fund,* 538 F.3d 594, 596 (7th Cir. 2008)). "If a complaint alleges only state-law claims, and if these claims are entirely encompassed by § 502(a), that complaint is converted from 'an ordinary state common law complaint into one stating a federal claim for purposes of the well-pleaded complaint rule.'" *Marin General,* 581 F.3d at 945 (quoting *Metro. Life Ins. Co. v. Taylor,* 481 U.S. 58, 65–66, 107 S.Ct. 1542, 95 L.Ed.2d 55 (1987)).

■ State law claims are completely preempted by § 502(a) if: (1) an individual, at some point in time, could have brought the claim under § 502(a); and (2) there is no other legal duty independent of ERISA or plan terms implicated by the defendant's actions. *Davila,* 542 U.S. at 210, 124 S.Ct. 2488. "A state-law cause of action is preempted … only if both prongs of the test are satisfied." *Marin General,* 581 F.3d at 947.

In a footnote, United cites to an Eleventh Circuit case, *Butero v. Royal Maccabees Life Ins. Co.,* 174 F.3d 1207, 1212 (11th Cir.1999), for the proposition that a claim is not completely preempted if it is not brought against an ERISA entity. *Butero* sets out a four element test for evaluating complete preemption (referred to in the decision as "superpreemption"), one element of which is that "the defendant must be an ERISA entity." *Id.* How-

ever, this Court follows and applies the Supreme Court's *Davila* test for complete preemption and, to the extent that the *Butero* analysis is inconsistent with *Davila*, it is not controlling. Moreover, the Eleventh Circuit has, itself, adopted the *Davila* test. *See Connecticut State Dental Ass'n v. Anthem Health Plans, Inc.,* 591 F.3d 1337, 1345 (11th Cir.2009) (discussing that *Davila* refines *Butero,* and, "[i]n accordance with the Supreme Court's directive," applying *Davila* ).

#### c. United's Fraud Claims

Providers argue that United's fraud claims are preempted because they relate to ERISA plans, could have been brought under ERISA § 502(a), and hinge on no legal duties outside of the ERISA plans. (Mot. at 9–11). United asserts, in turn, that it could not bring suit for damage to its own business interests under ERISA § 502(a), so the claims are not completely preempted; similarly, United argues that claims by an insurer for fraudulent billing asserting its own losses are not "defensively preempted" under ERISA § 514(a). (Opp. at 7–9). Moreover, United argues that it seeks damages on the basis of conduct that was fraudulent independent of ERISA § 502(a) or plan terms, and therefore its claims seeking recovery on behalf of self-funded plans are not preempted under either ERISA § 502(a) or § 514(a). (*Id.* at 11–12).

The Court evaluates these contentions as to the fraud claims, which includes the allegations of conspiracy to commit fraud.

#### i. *Express Preemption*

Providers argue that United's fraud claims "relate to" the plans because, for instance, the terms of these plans dictate what is covered and what is not. (Mot. at 9-11).

It is plain that California fraud law does not make reference to ERISA plans, as it is a law of general applicability that neither "acts immediately and exclusively upon ERISA plans," nor relies upon the existence of ERISA plans to operate. *See, e.g., Paulsen,* 559 F.3d at 1082 (finding that state law negligence claims did were not preempted under the "reference to" analysis because they were based on common law negligence principles and select California statutes, laws which did act "immediately and exclusively" on ERISA plans and the operation of which did not rely on the existence of ERISA plans). However, whether the fraud claim has a "connection with" ERISA plans requires additional analysis.

Common law fraud claims are an area of traditional state regulation, which places a "considerable burden" on the party asserting express preemption to overcome the presumption that Congress did not intend to displace state law. *See Trustees of AFTRA Health Fund v. Biondi,* 303 F.3d 765, 775 (7th Cir.2002) (quoting *De Buono v. NYSA–ILA Med. & Clinical Servs. Fund,* 520 U.S. 806, 814, 117 S.Ct. 1747, 138 L.Ed.2d 21 (1997)) (internal quotation marks omitted). However, even acknowledging this presumption, "the mere fact that States have traditionally regulated common law fraud does not, in and of itself, preclude [this] claim from being expressly preempted under § 1144(a), if allowing the claim to go forward would thwart the statutory objectives of ERISA." *Id.* (citing *Dillingham,* 519 U.S. at 330, 117 S.Ct. 832).

The fraud allegations here do not appear to directly implicate an ERISA-regulated relationship, such as that between plan and plan member, plan and employer, or employer and employee. Rather, this activity transpired between an out-of-network provider and a claims administrator—a relationship that, by itself, is not regulated by ERISA. *See Catholic Healthcare W.-Bay*

*Area v. Seafarers Health & Benefits Plan*, 321 Fed.Appx. 563, 564 (9th Cir.2008) (discussing that when a third party provider sued an ERISA plan "based on contractual obligations arising directly between the provider and the ERISA plan (or for misrepresentations of coverage made by the ERISA plan to the provider)," rather than suing derivatively as an assignee, "the dispute involves a contract and representations made between a third party provider and a plan-a relationship that is not governed by ERISA").

In *Blue Cross of California v. Anesthesia Care Associates Medical Group, Inc. ("Anesthesia Care")*, 187 F.3d 1045, 1053–54 (9th Cir.1999), the Ninth Circuit found that providers' claims against a health care plan for breach of their provider agreements did not encroach on ERISA relationships when: (1) the "claims [did] not involve construction of the terms of ERISA-covered benefit plans"; (2) the claims were not intertwined with beneficiaries' ERISA benefits "because there [was] no claim that beneficiaries [had] not received their full benefits under the plans, or any argument that interpretation of the provider agreements [would] somehow work a change in the benefits to which beneficiaries will be entitled under ERISA-covered plans"; and (3) the "claims concern[ed] only promises that Blue Cross made as a health care plan provider to its participating physicians, rather than "touch[ing] on Blue Cross' fiduciary status, or any claims that a beneficiary may make against Blue Cross in that capacity." *See also Providence Health Plan v. McDowell*, 385 F.3d 1168, 1172 (9th Cir.2004) (discussing that an insurer's breach of contract action against insured to recover payments pursuant to a reimbursement clause—which did not require interpreting the plan, or dictating or disputing the correctness of a benefits distribution—did not have the necessary "connection with" or "reference to" an ERISA plan). Although it is true that *Anesthesia Care* arguably points to some of the issues at play in this action, and while the claim is not entirely unrelated to the relationship between United and the plans/plan members, the fact remains that the primary relationship involved is that between a third party provider and a claims administrator. The alleged misconduct does not implicate a state law claim that would subject plans and plan sponsors to "conflicting directives," such that it would demonstrably be subsumed within the class of state law Congress would have expected ERISA to preempt.

Moreover, the Seventh Circuit's reasoning in *Biondi* and the Second Circuit's decision in *Geller v. County Line Auto Sales, Inc.*, 86 F.3d 18 (2d Cir.1996) are persuasive and suggest the same result. In these cases, the courts evaluated whether fraud claims brought by trustees against a participant (*Biondi*) and employer (*Geller*) were expressly preempted. In each case, there had been misrepresentations made as to whether a particular person, on whose behalf the plan had expended money, was, in fact, covered under the plan. *Geller*, 86 F.3d at 19–20; *Biondi*, 303 F.3d at 770–71. Both courts held that these fraud claims were not expressly preempted. *Geller*, 86 F.3d at 23; *Biondi*, 303 F.3d at 782. In reaching this result, *Geller* noted that "although the defendants improperly administered the plan, the essence of the plaintiffs' fraud claim does not rely on the pension plan's operation or management," but rather, the "bare bones" of the claim were that these defendants fraudulently misrepresented that someone was a full-time employee, and that the plaintiffs paid out funds on behalf of this person. 86 F.3d at 23. Moreover, *Geller* observed that "allowing ... [the] common law fraud claim would in no way

compromise the purpose of Congress and does not impede federal control over the regulation of employee benefit plans. To the contrary, 'insuring the honest administration of financially sound plans' is critical to the accomplishment of ERISA's mission." *Id.* (quoting *Pompano · v. Michael Schiavone & Sons, Inc.,* 680 F.2d 911, 914 (2d Cir.1982)). The court went on to state that "common law fraud claim, which seeks to advance the rights and expectations created by ERISA, is not preempted simply because it may have a tangential impact on employee benefit plans." *Id.* Finally, *Geller* observes that "[t]he plan was only the context in which this garden variety fraud occurred." *Id. Biondi* follows much the same analysis. *See Biondi,* 303 F.3d at 773–82.

Following the logic expressed in *Geller* and *Biondi,* and in light of the primary relationships implicated here, the Court concludes that United's fraud claims are not expressly preempted.

#### ii. *Complete Preemption*

##### a. *Davila's* First Prong

Under the first prong of *Davila,* the Court must inquire whether United could have brought this claim under ERISA. United, as neither a beneficiary nor a participant, would be unable to bring any claims under ERISA § 502(a)(1) to enforce or clarify rights under the relevant plans. However, as a fiduciary, United could bring claims under ERISA § 502(a)(3) to recover appropriate equitable relief as redress for violations of or to enforce plan terms. Indeed, United does bring § 502(a)(3) claims in the present litigation (discussed below).

"There is a divergence of views between the district courts as to what constitutes actions taken 'to enforce the terms of the plan'" under § 502(a)(3), with some holding that an entity acting on its own behalf was not proceeding as a fiduciary for purposes of a claim that would fall within the ambit of § 502(a)(3), while others define fiduciaries for purposes of a § 502(a)(3) claim more broadly. *See United Healthcare Servs., Inc. v. Sanctuary Surgical Ctr., Inc. ("Sanctuary Surgical"),* 5 F.Supp.3d 1350, 1358–59 (S.D.Fla.2014). If United seeks to recover, in its fiduciary capacity, what was purportedly over-spent as a result of Providers' alleged misrepresentations, this could fall within the ambit of a claim under ERISA § 502(a)(3). In contrast, to the extent United brings suit in its own right for its business losses, as it claims to do in its Opposition (Opp. at 7–10), then it may arguably not be operating as a fiduciary for the plans, such that a claim under ERISA would be unavailable. However, some jurisdictions consider a plan fiduciary to be bringing a claim that could have been brought under § 502(a)(3) even if the fiduciary's motivation in the suit is not to enforce the terms of the plan, but only to redress its own alleged injury. *See Sanctuary Surgical,* 5 F.Supp.3d at 1358–59 (noting the divergence in approaches taken by district courts on the issue of whether a claim could have been brought by a fiduciary under § 502(a)(3)).

In a way that is distinct from this case, United's cited cases generally do not include § 502(a)(3) claims. Moreover, those courts found that § 502(a)(3) did not completely preempt the relevant state · law claims for one of several reasons, including that the claims were not asserted by a party acting as a fiduciary (such that they could be asserted under § 502(a)(3)), or the damages recoverable under the asserted claim were unavailable under a § 502(a)(3) claim. *See, e.g., Sanctuary Surgical,* 5 F.Supp.3d at 1359–60 (holding that "United's conduct ... fail[ed] to satisfy the first prong of the *Davila* test because it is not made to appear that United seeks 'equitable relief' to enforce the terms

of the plans within the meaning of § 502(a)(3)").

Ultimately, despite the issues raised above, the Court need not reach a decision on this prong. The Court must deem both *Davila* prongs satisfied in order to find complete preemption, and the Court does not find the second prong satisfied, as next discussed.

### b. *Davila's* Second Prong

Here, Providers contend that "the only arguable basis for a duty to collect co-payments or coinsurance can be the ERISA plan provisions," and point to the fact that, per the FACC, the plans set the availability of coverage and amount of co-pay required for a given service. (Mot. at 10–11).

Pursuant to the second *Davila* prong, the Court must evaluate whether the claim implicates duties independent of ERISA. The Ninth Circuit has noted that "[t]his question requires a practical, rather than a formalistic, analysis because '[c]laimants simply cannot obtain relief by dressing up an ERISA benefits claim in the garb of a state law tort.'" *Fossen v. Blue Cross & Blue Shield of Montana, Inc.*, 660 F.3d 1102, 1110–11 (9th Cir.2011) (quoting *Cleghorn*, 408 F.3d at 1225).

■ United's claim rests on allegations that Providers made affirmative misrepresentations to United in submitting claims for reimbursement. (*See* FACC ¶ 287 ("Counterclaim Defendants made false representations of material fact to United in submitting claim forms to United.")). United does not contend that the duty to provide truthful claims submissions hinges on the terms of the individuals' plans. Rather, "[t]hese claims do not rely on, and are independent of, any duty under an ERISA plan." *Marin General*, 581 F.3d at 949. (*See also* Opp. at 11 ("Here, United's fraud claims seek damages, from Pro-

viders' general assets, due to conduct that was fraudulent, *independent of the precise terms of the plans at issue.*" (emphasis in original)). While the question of what payments would have been justified may require consultation of the plans themselves, it cannot be said that the fraud claim is based on no duties independent of ERISA or plan terms. *See, e.g., Ass'n of New Jersey Chiropractors v. Aetna, Inc.*, No. CIV.A. 09–3761 JAP, 2012 WL 1638166, at *5–7 (D.N.J. May 8, 2012) (holding, in suit involving counterclaims brought by health insurer against providers alleging that providers misrepresented and over-billed for services, that counterclaims were not preempted because the claims were "based upon an independent duty . . . under New Jersey's insurance fraud statute and common law" that "prohibit[s] providers from committing fraud, including submitting fraudulent bills to an insurer for payment").

It is true that the plans dictate what services are covered and what reimbursement is proper for such services. The plans exclude services for certain procedures, meaning that alleged omission of excluded services in bills for otherwise permissible procedures could have caused improper benefit disbursements. It is not unprecedented to find that claims arising out of activities such as miscoding are preempted. *See, e.g., Blue Cross & Blue Shield of Rhode Island v. Korsen*, 746 F.Supp.2d 375, 381–84 (D.R.I.2010) (holding, in suit brought by health insurer against providers alleging that providers intentionally miscoded services, that the insurer's claims to recover overpayments were preempted and converted into § 502(a)(3) claims because "the crux of the dispute" involved a benefits determination, and even though the providers' agreements imposed duties on the defendants, they did not impose duties independent of ERISA).

Still, the Ninth Circuit has said, in the context of § 502 complete preemption, that "[w]here the meaning of a term in the Plan is not subject to dispute, the bare fact that the Plan may be consulted in the course of litigating a state-law claim does not require that the claim be extinguished by ERISA's enforcement provision." *Anesthesia Care Associates Med. Grp., Inc.*, 187 F.3d at 1051. In *Davila*, the Court analyzed whether ERISA preempted claims brought pursuant to a Texas state law requiring that managed care entities exercise ordinary care when making benefit decisions. 542 U.S. at 204, 212–13, 124 S.Ct. 2488. This state law contained a provision stating that it did not require that managed care entities provide treatment for services not otherwise covered by the relevant health care plan. *Id.* at 213, 124 S.Ct. 2488. As such, the Court found that "interpretation of the terms of [the relevant] benefit plans form[ed] an essential part of" the asserted state law claim, and liability under the state law "would exist ... only because of petitioners' administration of ERISA-regulated benefit plans." *Id.*

Here, the alleged misrepresentations, while linked to the plans in terms of damage calculation, are wrongful irrespective of the plan terms. This case does not present the same scenario analyzed in *Davila*, in which adherence to plan terms obviated any potential violation of the implicated state law.

As such, the second *Davila* prong weighs against preemption. Because both *Davila* prongs must be satisfied before a claim is completely preempted, Providers' motion to dismiss United's fraud claim on the basis of preemption fails.

### d. United's Remaining State Law Claims

Providers advance a similar argument as to the remaining state law claims; namely, that these claims are preempted because they relate to ERISA plans and could have been brought under ERISA section 502(a). (Mot. at 9, 11–12). United responds to Providers' preemption argument with the same contentions discussed in the fraud analysis above.

#### i. UCL

In its UCL claim, United alleges that the Counter–Defendants have engaged in a number of unfair, unlawful, and fraudulent activities, including submission of false claims, participation in a scheme to own and operate a network of clinics and surgery centers in violation of California's prohibition on the corporate practice of medicine, and improper payment of incentives to physicians for patient referrals. (FACC ¶¶ 295–302).

■ *Express Preemption*: Applying the "relationship test," the UCL claim does not directly implicate an ERISA-regulated relationship. Rather, the UCL claim pertains to the actions taken by out-of-network providers in relation to an ERISA claims administrator (and the group health plans it administers) and California consumers. Moreover, much the same rationale that informs the Court's preemption holding for the fraud claim is applicable to the UCL claim, as they are premised upon many of the same allegations. Permitting this claim to proceed does not "compromise the purpose of Congress and does not impede federal control over the regulation of employee benefit plans," and is harmonious with the objective of protecting the integrity of employee benefit plans. *Geller*, 86 F.3d at 22–23.

The Court concludes, therefore, that the UCL claim is not expressly preempted.

■ *Complete Preemption*: Turning to the second *Davila* prong first, the conduct referenced in the UCL allegations

depends upon legal duties that are independent of ERISA and plan terms. For instance, the duty to adhere to California's prohibitions on the corporate practice of medicine and incentivization of patient referrals are quite outside the duties imposed by ERISA. Moreover, the alleged fraudulent practices, as discussed above, implicate duties derived from state law, which imposed upon Providers an independent "duty to refrain from making misrepresentations in the presentation of insurance claims for benefits." *Sanctuary Surgical*, 5 F.Supp.3d at 1361.

In light of this conclusion, the Court need not analyze the first *Davila* prong. The UCL claim is not completely preempted.

### ii. *Intentional Interference with Contractual Relationships*

United alleges that Providers used promises of co-pay waivers to induce members to accept services, which constituted illegal interference "with the contract between United Members, the group health plans in which they participate, and (in certain instances) United as insurer." (FACC ¶ 310). United further alleges that "by accepting assignments from, and acting as authorized representatives of the United members, and then submitting false or inflated bills for services, the Counterclaim Defendants illegally interfered with the contractual relationship between United and its members." (*Id.* ¶ 314).

■ *Express Preemption*: The intentional interference claim contains many of the same allegations that underlie the fraud claim, and allowing parties to an insurance contract to redress interlopers' interference is certainly consistent with the objective of protecting the integrity of employee benefit plans. Moreover, while ERISA plans are certainly implicated in the alleged activity, the conduct at issue is that of a third party provider acting upon the contractual relationship between United and members.

Scenarios in which the Ninth Circuit has previously found interference claims to be preempted—including cases decided prior to the Ninth Circuit's opinion in *General American Life Insurance Co. v. Castonguay*, 984 F.2d 1518, 1521 (9th Cir.1993), which first introduced the relationship test, and the Supreme Court's decision in *Travelers*—are distinguishable. For instance, the Ninth Circuit found that a claim brought by a former employee against his prior employer for interference with a protected property interest (retirement benefits) arising out of an ERISA plan was preempted as referring to the plan. *Sorosky v. Burroughs Corp.*, 826 F.2d 794, 800 (9th Cir.1987); *see also Greany v. W. Farm Bureau Life Ins. Co.*, 973 F.2d 812, 819 (9th Cir.1992) (holding that a tortious interference with contract claim was preempted when asserted by a former employee against his prior employer and the related Trust arising out of communications to the group plan insurer that the employee was no longer covered under the plan). Even though *Sorosky* and *Greany* do not apply the relationship test, the relationships implicated—between employer (and Trust in *Greany*) and employee—are patently at the center of ERISA, while conduct undertaken by an outsider to ERISA-governed relationships is not of the same primacy.

■ *Complete Preemption*: Much like the legal duties implicated by the fraud claims, the duty to refrain from interference with the contractual relationships of others arises independently from ERISA or the duties under an ERISA plan. In light of this conclusion, the Court need not analyze the first *Davila* prong. The inten-

tional interference claim is not completely preempted.

Again, Ninth Circuit cases that have held differently are distinguishable. *Sorosky* (though decided prior to *Davila* ) held that the interference claim at issue was completely preempted as falling within the scope of ERISA § 502(a)(3). *Sorosky*, 826 F.2d at 800. In that case, however, ERISA § 502(a)(3) provided an avenue for the employee to enforce his ERISA § 510 rights to non-interference. *Id. See also Tingey v. Pixley–Richards W., Inc.*, 953 F.2d 1124, 1131 (9th Cir.1992) (holding that a claim for intentional interference, arising out of an employer's alleged termination of an employee so as to deny him benefits, was subject to preemption). Here, the alleged interference is not of the same kind, as it is not interference that was purportedly undertaken by an employer (potentially to avoid paying benefits under the plan in a manner ERISA itself declares impermissible), but rather interference effected by an alleged outsider.

### 2. United's Fraud and Conspiracy Claims

In addition to their preemption arguments, Providers contend that United has failed to adequately allege its claims for fraud, and, consequently, the claim for conspiracy predicated upon such fraud. (Mot. at 12–17).

Under California law, "[t]he elements of fraud, which give rise to the tort action for deceit, are (a) misrepresentation (false representation, concealment, or non-disclosure); (b) knowledge of falsity (or 'scienter'); (c) intent to defraud, i.e., to induce reliance; (d) justifiable reliance; and (e) resulting damage." 5 B.E. Witkin, *Summary of California Law*, Torts § 772, at 1121 (10th ed.2005).

### a. Fraud Allegations Re: Non–Contracted Providers and Duty to Collect Co–Pays

#### i. *Duty*

Providers argue that waiver or discount of patient co-pay by out-of-network providers is not fraudulent under California law since there is no California authority that imposes a duty for such providers to collect or disclose collection of co-pay. (Mot. at 12). However, Providers misconstrue the FACC's allegations—this is not a case of non-disclosure absent an affirmative duty, but rather an instance in which affirmative misrepresentations were alleged to have been made during the course of claims submissions.

In support of their position, Providers cite to a 1981 California Attorney General Opinion. (*See* Mot. at 12–13 (citing 64 Ops. Cal. Att'y. Gen. 782, 1981 WL 126814 (1981)). In that Opinion, the Attorney General interpreted whether a dentist's failure to report deductions of co-pay in reporting his "usual fee" pursuant to a provision in a dental insurance plan violated California laws against misrepresentation and fraud. 64 Cal. Op. Att'y Gen. 782, 1981 WL 126814, at *1–2 (1981). Because the term "usual fee" in the plan was ambiguous, and the term was to be construed against the insurer who drafted the plan, the Attorney General found that the plan could be interpreted to allow co-pay to be included in "usual fee" even when the patient did not have to pay it. *Id.* at *3.

Providers also cite to *Buller v. Sutter Health*, 160 Cal.App.4th 981, 74 Cal. Rptr.3d 47 (2008). (Mot. at 13–14). In *Buller*, the Court of Appeal considered whether a provider's bills violated the UCL because they did not disclose that discounts would be provided for patients who paid promptly. 160 Cal.App.4th at 984–85, 74 Cal.Rptr.3d 47. The *Buller* complaint did not allege that there was an

affirmative duty to disclose prompt-pay discounts, and thus the failure to reveal such a policy was found not to be fraudulent under the UCL. *Id.* at 988, 74 Cal. Rptr.3d 47. While the plaintiff argued that the court had mischaracterized his complaint as one alleging a failure to disclose when he actually was arguing that the amount owed was misrepresented, the complaint itself repeatedly alleged a failure to disclose. *Id.* Moreover, the plaintiff claimed that he was challenging a practice of inflation and misrepresentation of balances due on invoices, but the court disagreed; rather, the court found that "[t]he balance is exactly what a patient with private insurance owes after the insurance company pays its portion of the charges." *Id.* at 989, 74 Cal.Rptr.3d 47. The court recognized a difference "between the practice of artificially inflating the price of a service beyond its actual cost and the practice of voluntarily offering customers discounts on a properly priced service," and noted that there were no allegations in the complaint that "the initial amount charged ... [was] improper on its face." *Id.*

Both the Attorney General Opinion and *Buller* are inapposite. The term "usual fee" as discussed in the Attorney General Opinion necessarily is not tied to a specific patient and service. In contrast, as alleged in the FACC, "Charges" or "Total Charges" were meant to reflect the fees actually charged to the patient for the claims reflected on the forms. (FACC ¶¶ 56, 288). Moreover, the Attorney General was interpreting an ambiguity in an insurance plan against the drafter, in accordance with well-established rules of insurance contract interpretation. Here, however, the "Total Charges" prompt—which United alleges created a duty to disclose what the actual charge for the services rendered were (*id.* ¶¶ 55–57)—did not come from a document that United drafted. Rather, United alleges that

"[t]hese are forms approved and generated in connection with the federal Medicare program, and it is common in the health care industry for these same forms to be used in connection with other governmental and non-governmental insurance." (*Id.* ¶ 55). Therefore, the interpretation afforded by the Attorney General is inapplicable here.

Moreover, unlike in *Buller*, the issue here is not whether an alleged failure to disclose to patients that they may be eligible for discounts if they pay promptly is objectionable; or, indeed, whether the provision of a discount in isolation is objectionable. Rather, the case before the Court asks whether reporting **charges** to an insurer that allegedly fail to account for co-pay waivers but are meant to reflect the fees actually charged to the patient constitutes a misrepresentation—precisely the issue of impropriety of initial charges that *Bueller* distinguished. The allegations in the FACC support a finding that Providers' purported practice constitutes misrepresentation. Providers cite to no binding authority that counsels a different result.

### ii. *Misrepresentations*

Providers contend that they made no misrepresentations by failing to disclose waiver of co-pay because the industry-standard billing forms contain no spaces for disclosure of discounts. (Mot. at 15). Rather, Providers state that they "did here what every other healthcare provider does," and simply noted their "Total Charges" on these forms, making no representations as to whether they would collect co-pay obligations. (*Id.* at 16). Providers also note that they did not know the amounts of the relevant co-pays until after they had submitted these forms, since providers do not learn these amounts until the insurer or plan sends an Explanation of

Benefits ("EOB") in response to claim submissions. (*Id.*). Providers cite to the Declaration of Araminta Salazar ("Salazar Declaration") as evidence of the EOB format. (*Id.*).

As a preliminary matter, Providers' assertion that the FACC alleges no misrepresentations ignores the FACC's allegations outside of the deduction context. Providers focus on United's fraud allegations regarding waiver of co-pay, and neglect to address United's other fraud allegations; namely that Providers submitted "[f]raudulent claims that misrepresented the nature of the procedure performed, or in some cases, completely failed to disclose that the member received a gastric Lap Band," "[f]raudulent claims that sought payment for services which were charged using inflated CPT codes," "[f]raudulent claims that sought payment for services which were never performed," "[f]raudulent claims that inflated the member's BMI in order to receive secure coverage for the Lap Band surgery," and "[f]raudulent claims that demanded exorbitant fees far in excess of the usual and customary rate." (FACC ¶ 285).

Moreover, even as to the deductions, as discussed above, United has alleged conduct that could amount to affirmative misrepresentations. Providers argue that they were not aware of co-pay amounts when they submitted the claims for reimbursement (Mot. at 16), but the allegations of misrepresentations in the FACC are not negated by invocation of these factual issues at this stage in the proceedings.

### iii. *Reasonable Reliance*

Finally, Providers claim that, as there were no misrepresentations made, United fails to demonstrate reasonable reliance on any misstatements. (Mot. at 17). Moreover, Providers point to the methods United uses to calculate "eligible expenses," and argue that since only one of the four

methodologies has anything to do with billed charges, and the FACC does not specify which plans calculated payments based on total charges, United fails to plead reliance on Providers' charges. (*Id.*).

As discussed above, United *has* properly alleged that misrepresentations were made. As such, reasonable reliance cannot be immediately discounted. Indeed, in the FACC, United alleges that, without knowledge of the co-pay waivers (which, United contends, negate its obligation under plans to pay at all), it "reasonably relied on the false and misleading claim information submitted by the Counterclaim Defendants regarding their charges and the procedures performed, which resulted in the approval of payments to the Counterclaim Defendants totaling more than $43,000,000 that would not otherwise have been approved." (FACC ¶ 58). In sum, the purportedly misleading charges included on claims forms are alleged to have resulted in payments that would not otherwise have been made.

Moreover, Providers fail to take into account the various non-discount misrepresentations and related reliance alleged in the FACC. For example, United alleges that it "reasonably relied on the misrepresentations contained on the claim forms submitted by Counterclaim Defendants, and in good faith paid ... thousands of claims based on those misrepresentations." (*Id.* ¶ 281). The types of misrepresentations upon which United claims to have "reasonably relied" include not only those related to co-payment waiver, but also inflated CPT codes, billing for services that were never provided, and masking of Lap Band expenses by labeling the procedures as a different, covered expense. (*Id.* ¶¶ 281, 287, 289). Providers' argument that there can be no reasonable reliance on the billed charges when only one method-

ology for calculating payments relies on such charges (Mot. at 17) fails to account for the instances of alleged fraud involving improper descriptions of the actual services rendered.

■■■ "Under California law, ... whether reliance was reasonable is a question of fact for the jury, and may be decided as a matter of law only if the facts permit reasonable minds to come to just one conclusion." *Boeken v. Philip Morris Inc.*, 127 Cal.App.4th 1640, 1666, 26 Cal.Rptr.3d 638 (2005) (citing *Alliance Mortg. Co. v. Rothwell*, 10 Cal.4th 1226, 1239, 44 Cal. Rptr.2d 352, 900 P.2d 601 (1995)); *see also Grisham v. Philip Morris, Inc.*, 670 F.Supp.2d 1014 (C.D.Cal.2009) (discussing the same standard in connection with a fraudulent concealment tolling issue). At this early stage, however, United has adequately alleged that it reasonably relied upon various purported misrepresentations.

#### iv. *Pleading With Particularity*

■■■ In sum, the Court finds that United adequately alleged many types of misrepresentations and the presence of reasonable reliance thereon. However, as discussed in the Order adjudicating the Omidi Counter–Defendants' Motion to Dismiss the First Amended Counterclaim and Joinder in Counterclaim Defendants Almont Ambulatory Surgery Center, LLC, et al.'s Motion to Dismiss and Strike First Amended Counterclaim (the "Omidis' Motion to Dismiss"), the FACC does not specify the "who, what, when, where, and how" of each individual instance of fraud alleged to be at issue, as required by Rule 9(b). As such, the Court concludes that the fraud count is insufficiently alleged.

#### b. Providers' Palacios Declaration

Providers posit that the Palacios Declaration filed with the Motion demonstrates why allegations regarding individual members are false. (Mot. at 12).

Generally, pursuant to Federal Rule of Civil Procedure 12(d), if "matters outside the pleadings are presented to and not excluded by the court," a 12(b)(6) motion to dismiss "must be treated as" a motion for summary judgment under Rule 56. However, under the doctrine of incorporation by reference, "'a court may look beyond the pleadings without converting the Rule 12(b)(6) motion into one for summary judgment.'" *Davis v. HSBC Bank Nevada, N.A.*, 691 F.3d 1152, 1160 (9th Cir.2012) (quoting *Van Buskirk v. Cable News Network, Inc.*, 284 F.3d 977, 980 (9th Cir.2002)). Pursuant to this doctrine, a district court may "consider documents 'whose contents are alleged in a complaint and whose authenticity no party questions, but which are not physically attached to the [plaintiff's] pleading.'" *In re Silicon Graphics Inc. Sec. Litig.*, 183 F.3d 970, 986 (9th Cir.1999) *abrogated on other grounds by Reese v. Malone*, 747 F.3d 557 (9th Cir.2014) (quoting *Branch v. Tunnell*, 14 F.3d 449, 454 (9th Cir.1994)).

Here, United posits that the medical records supplied in connection with this declaration "may themselves be fraudulent," so, at the very least, it appears the "authenticity" factor of the judicial notice evaluation is not satisfied. (Opp. at 15). As such, the Court could not consider these documents without converting the Motion into a motion for summary judgment, which it declines to do.

#### 3. United's UCL Claim

California's UCL prohibits "any unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising." Cal. Bus. & Prof. Code § 17200. "Because the statute is written in the disjunctive, it is violated where a defendant's act or practice vio-

lates any of the foregoing prongs." *Davis v. HSBC Bank Nevada, N.A.*, 691 F.3d 1152, 1168 (9th Cir.2012).

Because the Court has determined that United does not have standing to assert a UCL claim on behalf of self-funded plans, the following analysis pertains only to United's UCL claim on behalf of fully-insured plans.

### a. "Unfair" Conduct

The FACC alleges that "Counterclaim Defendants' conduct and scheme to defraud offends the established public policy of California to protect consumers and is unethical, oppressive, unscrupulous, immoral, and substantially injurious to California consumers." (FACC ¶ 300). Providers combat allegations of "unfair" activity in the FACC solely by arguing that United must demonstrate that it is a consumer or competitor in order to bring a UCL claim. (Mot. at 17–18). As such, the Court need not, at present, address the tests used in California to gauge whether certain conduct is "unfair" within the meaning of the UCL.

■ In *Clayworth v. Pfizer, Inc.*, 49 Cal.4th 758, 111 Cal.Rptr.3d 666, 233 P.3d 1066 (2010), the California Supreme Court found that pharmacies had satisfied UCL standing requirements—despite the fact that they had had only indirect business dealings with the defendants—when the pharmacies lost money in the form of overcharges as the result of the defendants' illegal price fixing activity. *Id.* at 788, 111 Cal.Rptr.3d 666, 233 P.3d 1066. While *Clayworth* involved allegations of "unlawful" activity, the Court finds it sufficiently analogous to the present action to determine that United is not barred from challenging purportedly "unfair" conduct on the basis that it may not have ultimately consumed Providers' services. As the *Clayworth* court noted, "[w]hile the voters clearly intended to restrict UCL standing,

they just as plainly preserved standing for those who had had business dealings with a defendant and had lost money or property as a result of the defendant's unfair business practices." *Id.* United, according to the allegations in the FACC, would fall squarely within this category. As such, Providers' arguments regarding United's status as neither competitor nor consumer are unavailing under the facts of this case.

The allegations informing the "unfair" UCL prong do appear to largely overlap with those that support the "fraudulent" prong. (*See* FACC ¶ 296 ("Counterclaim Defendants' submission to United of false claims, including waiving Member Responsibility Amounts, is an unlawful, unfair, and fraudulent business practices in violation of California Business & Professions Code § 17200, *et seq.*"); *see also id.* ¶ 301 ("United and the group health plans it administers have been subjected to and injured by Counterclaim Defendant's ... unfair practices, including promises to patients that they would not incur any out of pocket expenses, regardless of what insurance required, and that the Counterclaim Defendants would look solely to insurance for payment.")). To the extent this is true, the Court aligns its "unfair" evaluation with the "fraudulent" analysis below.

### b. "Unlawful" Conduct

"By proscribing 'any unlawful' business practice, 'section 17200 'borrows' violations of other laws and treats them as unlawful practices' that the unfair competition law makes independently actionable." *Cel-Tech*, 20 Cal.4th at 180, 83 Cal.Rptr.2d 548, 973 P.2d 527 (1999) (quoting *State Farm Fire & Casualty Co. v. Superior Court*, 45 Cal.App.4th 1093, 1103, 53 Cal.Rptr.2d 229 (1996)). "However, such allegations 'must state with reasonable particularity the facts supporting the statutory elements' of the alleged violation." *Romero v. Coun-*

*trywide Bank, N.A.*, 740 F.Supp.2d 1129, 1147 (N.D.Cal.2010) (quoting *Silicon Knights, Inc. v. Crystal Dynamics, Inc.*, 983 F.Supp. 1303, 1316 (N.D.Cal.1997)).

Providers contend that several predicate statutes invoked by United for "unlawful" allegations all "prohibit the making of false statements." (Mot. at 18). Providers argue that "United has failed to allege violation of any of these statutes because United has failed to allege any false statements." (*Id.* at 18). In support of this contention, Providers again argue that the alleged waiver of co-pay does not constitute a misrepresentation. (*Id.* at 18–19). Moreover, Providers argue that the FACC fails to properly allege that Providers violated California's doctrine prohibiting the corporate practice of medicine. (*Id.* at 19). Finally, Providers argue that the FACC fails to plead a "credible violation" of a California statute prohibiting payments of incentives to physicians for patient referrals. (*Id.* at 20).

### i. False Statements: 18 U.S.C. § 1347; California Penal Code sections 532(a) & 550(b); California Business & Professions Code section 810(a)

Providers point out that several of the statutes invoked by United share a common thread in that they "prohibit the making of false statements." (Mot. at 18). United appears to agree. (Opp. at 17–18 ("Providers concede that these provisions prohibit false statements in the health-insurance context and serve as a valid UCL predicate.")). As a result, there is significant overlap between the allegations informing the "unlawful" portion of the UCL claim—asserted based on statutes that purportedly prohibit the making of false statements—and the "fraudulent" portion. Providers argue that "United has failed to allege violation of any of these statutes because United has failed to allege any false statements." (Mot. at 18).

At its core, United's allegations based upon these predicate statutes are still tied to the underlying fraud allegations permeating the FACC. "In some cases, the plaintiff may allege a unified course of fraudulent conduct and rely entirely on that course of conduct as the basis of a claim. In that event, the claim is said to be 'grounded in fraud' or to 'sound in fraud,' and the pleading of that claim as a whole must satisfy the particularity requirement of Rule 9(b)." *Vess v. Ciba–Geigy Corp. USA,* 317 F.3d 1097, 1103–04 (9th Cir.2003).

The Court aligns its conclusion here with the "fraudulent" analysis below and concludes that United has failed to sufficiently allege "unlawful" conduct regarding the making of false statements as it has failed to satisfy the requirements of Rule 9(b). The Court does not presently decide whether United would otherwise have stated a valid claim under the "unlawful" prong of the UCL for violation of these predicate statutes.

### ii. Corporate Practice of Medicine

It appears to the Court that one of the statutes cited in the FACC (¶ 298) in connection with the corporate practice of medicine was referenced in error—California Business and Professions Code section 2254, which in fact provides that "violation of Section 123440 of the Health and Safety Code, relating to research on aborted products of human conception," constitutes unprofessional conduct. Nonetheless, the Court will evaluate the corporate practice of medicine issue more generally.

California law is clear that "neither a corporation nor any other unlicensed person or entity may engage, directly or indirectly, in the practice of certain learned professions including the legal, medical and dental professions." *Pac. Employers*

*Ins. Co. v. Carpenter,* 10 Cal.App.2d 592, 594–95, 52 P.2d 992 (1935). "Courts have said that the ban on the corporate practice of medicine 'is intended to ameliorate the evils of divided loyalty and impaired confidence which are thought to be created when a corporation solicits medical business from the general public and turns it over to a special group of doctors, who are thus under lay control.'" *People v. Cole,* 38 Cal.4th 964, 971, 44 Cal.Rptr.3d 261, 135 P.3d 669 (2006) (quoting *Conrad v. Med. Bd. of California,* 48 Cal.App.4th 1038, 1042, 55 Cal.Rptr.2d 901, 903 (1996)) (internal quotation marks omitted). The ban is subject to certain exceptions; for example, "physicians may be employed on a salaried basis by licensed charitable institutions, foundations, or clinics, if patients are not charged for the professional services rendered." *Conrad,* 48 Cal. App.4th at 1043, 55 Cal.Rptr.2d 901.

Here, Providers do not assert that an exception to the ban on corporate practice of law applies. Instead, Providers point to allegations in the FACC that Dr. Eliot Alpert is "the CEO of numerous properly registered, physician-owned medical corporations established on behalf of various 'Omidi physician[s],'" and argue that these are "properly owned medical corporations [that] do not violate the doctrine." (Mot. at 19). Similarly, Providers argue that "facilities such as surgery centers ... do not 'practice medicine' and can be owned by laypeople" and that United's "rank speculation" about the influence Julian Omidi and non-party "Dr. Bobby" may have exerted over "unidentified entities" does not suffice to state a violation of the doctrine. *(Id.).*

It is true that the cited authority, *Capen v. Shewry,* 155 Cal.App.4th 378, 384, 65 Cal.Rptr.3d 890 (2007), discusses how surgical clinics owned by non-physicians are to be regulated, lending the impression that such non-physician ownership is acceptable under California law. *(See* Mot. at 19). However, the FACC alleges more than mere ownership of surgical facilities by non-physicians. The FACC alleges, for example, that Julian Omidi instructed a surgeon, Dr. Ishan Najib Shamaan, to:

> [S]ign approximately 600 "preprinted" form letters seeking insurer approval for surgery. These letters were then sent to health insurers to demonstrate that surgery was medically necessary. Dr. Shamaan ... testified that (1) he had not actually examined these patients before signing these approval letters; (2) the portion of the letter that supposedly described the patient's particular medical condition was actually pre-printed boilerplate....

(FACC ¶ 107(c)). Providers cite to no authority that would remove such alleged conduct from the ambit of the "evils of divided loyalty and impaired confidence" informing the corporate practice of medicine doctrine.

Accordingly, United has adequately alleged "unlawful" conduct in connection with the corporate practice of medicine.

### iii. *Incentives for Patient Referrals: California Business & Professions Code section 650(a)*

California Business & Professions Code section 650(a) provides, in relevant part, that:

> *[T]he offer, delivery, receipt, or acceptance* by any person licensed under this division or the Chiropractic Initiative Act *of any* rebate, refund, *commission,* preference, patronage dividend, discount, *or other consideration,* whether in the form of money or otherwise, *as compensation or inducement for referring patients,* clients, or customers to any person, irrespective of any member-

ship, proprietary interest, or coownership in or with any person to whom these patients, clients, or customers are referred *is unlawful.*

(emphasis added). California Business & Professions Code section 650(b), however, exempts "payment or receipt of consideration for services other than the referral of patients which is based on a percentage of gross revenue or similar type of contractual arrangement . . . if the consideration is commensurate with the value of the services furnished." "Section 650 'was enacted (1) to ensure that referrals would not be induced by considerations other than the best interest of the patient and (2) to prevent patients being charged more for treatment because of an additional hidden fee imposed to recoup payment for securing the referral.'" *People v. Guiamelon,* 205 Cal.App.4th 383, 399, 140 Cal.Rptr.3d 584 (2012) (citations omitted).

The FACC alleges that "physicians contracting with Top Surgeons and practicing at the Counterclaim Defendant surgery centers are promised bonuses, on a per-procedure basis, for performing a certain number of procedures." (FACC ¶ 108). The FACC provides examples of such bonus amounts. (*See id.*). Providers, however, contend that the FACC does not allege "any agreement that provides payment for patient referrals. At most, it alleges that certain physicians who are not parties to this action had independent contractor agreements with Counter–Defendant Top Surgeons that paid per procedure performed (or an annual salary), and in some cases, volume-based bonuses." (Mot. at 20).

Neither party discusses the licensure requirement of California Business & Professions Code section 650(a). However, for purposes of adjudicating this Motion, the Court will assume that licensure is not an issue.

Reading the allegations in the FACC in the light most favorable to United, the fee structure alleged—which incentivizes physicians to perform a certain number of their surgeries at Counterclaim Defendants surgery centers in order to receive bonuses—is, at its core, a method of providing financial incentives for the referral of patients to Counterclaim Defendant surgical centers. The alleged bonuses are specifically dictated by how many patients the physicians bring in to treat at Counterclaim Defendant facilities. Providers cite to no authority that would remove such activity from the ambit of California Business & Professions Code section 650(a).

Accordingly, United has adequately alleged "unlawful" conduct in connection with incentives provided for the referral of patients.

### c. "Fraudulent" Conduct

"Unlike common law fraud, a party can show a violation of the UCL's 'fraudulent practices' prong without allegations of actual deception." *In re Sony Grand Wega KDF–E A10/A20 Series Rear Projection HDTV Television Litig.,* 758 F.Supp.2d 1077, 1092 (S.D.Cal.2010). "[A] 'fraudulent' business practice under § 17200 is 'one which is likely to deceive the public,' and 'may be based on representations to the public which are untrue, and also those which may be accurate on some level, but will nonetheless tend to mislead or deceive.'" *In re WellPoint, Inc. Out-of-Network UCR Rates Litig.,* 865 F.Supp.2d 1002, 1047 (C.D.Cal.2011) (quoting *McKell v. Washington Mut., Inc.,* 142 Cal.App.4th 1457, 1471, 49 Cal.Rptr.3d 227 (2006)).

The California Supreme Court has stated that "[t]he requirement that fraud be pleaded with specificity . . . does not apply to causes of action under the con-

sumer protection statutes." *Comm. On Children's Television, Inc. v. Gen. Foods Corp.*, 35 Cal.3d 197, 212 n. 11, 197 Cal. Rptr. 783, 673 P.2d 660 (1983), *superseded by Proposition 64 on other grounds.* However, in federal court, UCL claims that are grounded in fraud still must be pleaded with particularity under Rule 9(b). *Kearns v. Ford Motor Co.*, 567 F.3d 1120, 1125 (9th Cir.2009).

■ Providers assert that, for the same reasons argued in relation to the fraud claim, United's fraudulent UCL claim fails. (Mot. at 20). Although the standard for fraudulent activity under the UCL varies from that at common law, the allegations supporting both the fraud claim and the "fraudulent" prong of the UCL claim appear to be substantially the same. In connection with the fraudulent prong, the FACC alleges that the Counterclaim Defendants "falsified medical and claims records which purport to bill for services that were not medically necessary or were never rendered, that conceal services rendered, or that substantiate services based on false BMI measurements." (FACC ¶ 301). Such activity is relevant for patients who could ultimately be liable for the (allegedly fraudulent) billed charges. However, as discussed more fully in the Order adjudicating the Omidis' Motion to Dismiss, United fails to satisfy Rule 9(b)'s particularity requirement regarding the misconduct charged against each Counterclaim Defendant. As a result, the Court cannot find that United has adequately pleaded its claims that sound in fraud.

Accordingly, United has failed to adequately allege "fraudulent" conduct.

### 4. United's Intentional Interference Claim

United alleges that "Counterclaim Defendants were aware that health benefit plans generally include provisions precluding participants from accepting services from providers in return for a waiver of Member Responsibility Amounts," and, in spite of this knowledge, induced "United members to accept services with the Counterclaim Defendants by promises that they would waive patient responsibilities and accept whatever payment their health benefit plan would pay." (FACC ¶ 310). In so doing, United alleges that the Counterclaim Defendants "illegally interfered with the contract between United Members, the group health plans in which they participate, and (in certain instances) United as insurer." (*Id.*).

■ In order to properly plead a claim for tortious interference with contractual relations, a party must allege: "(1) it has a valid and existing contract with a third party; (2) defendants had knowledge of the contract; (3) defendants committed an intentional act designed to induce a breach or disrupt the contractual relationship; (4) actual breach or disruption of the contract relationship occurred; and (5) damages were suffered as a result." *Sebastian Int'l, Inc. v. Russolillo*, 162 F.Supp.2d 1198, 1203 (C.D.Cal.2001) (citing *Quelimane Co. Inc. v. Stewart Title Guaranty Co.*, 19 Cal.4th 26, 55, 77 Cal.Rptr.2d 709, 960 P.2d 513 (1998); *Pacific Gas & Electric Co. v. Bear Stearns & Co.*, 50 Cal.3d 1118, 1126, 270 Cal.Rptr. 1, 791 P.2d 587 (1990)).

Providers argue that the FACC's intentional interference claim fails because: the claim is preempted; the providers cannot be liable for interfering with a contract to which they are a party; United is a stranger to the contracts between the self-funded plans and their patients; the FACC only alleges that the waiver of co-pay "negated" coverage, and this does not constitute a breach; and United's allegations regarding "overuse of health plan benefits" are not sufficient to support the

claim, since they are too speculative. (Mot. at 20–22). The Court will evaluate these arguments in turn.

### a. Preemption

As preemption of United's state law claims is discussed above, it will not be reiterated here.

### b. Providers as Parties to the Contracts

■ As Providers point out, "the tort cause of action for interference with a contract does not lie against a party to the contract." *Applied Equip. Corp. v. Litton Saudi Arabia Ltd.*, 7 Cal.4th 503, 514, 28 Cal.Rptr.2d 475, 869 P.2d 454 (1994) (citing *Shoemaker v. Myers*, 52 Cal.3d 1, 24–25, 276 Cal.Rptr. 303, 801 P.2d 1054 (1990); *Kelly v. General Telephone Co.*, 136 Cal. App.3d 278, 288, 186 Cal.Rptr. 184 (1982); *Dryden v. Tri–Valley Growers*, 65 Cal. App.3d 990, 998, 135 Cal.Rptr. 720 (1977)). "California law has long recognized that the core of intentional interference business torts is interference with an economic relationship by a third-party stranger to that relationship." *ViChip Corp. v. Lee*, 438 F.Supp.2d 1087, 1097 (N.D.Cal.2006) (citing *Della Penna v. Toyota Motor Sales U.S.A., Inc.*, 11 Cal.4th 376, 45 Cal.Rptr.2d 436, 902 P.2d 740 (1995)).

Providers argue that they are a party to the contracts between United and its members by virtue of the assignments they received from patients, and therefore cannot properly be said to have interfered with the contracts. (Mot. at 21). Providers contend that United cannot on the one hand claim that Providers had a duty to collect co-pay under the plans, and yet argue that the Providers are strangers to the contractual relationship. (*Id.*). Finally, Providers argue that United fails to "credibly plead" that the purported interference took place prior to any assignment of benefits. (*Id.*).

Here, the FACC alleges that patients did not always make assignments, and even assignments that were made were sometimes rendered invalid by, for example, operation of several plans' anti-assignment provisions. (FACC ¶¶ 271, 312–13). Thus, to the extent that Providers allege party status on the basis of assignments, the allegations in the FACC suggest that at least some of these assignments might not be viable.

■ Further, even in instances where assignments are valid, United alleges that, "in many cases," the purported interference took place when Providers induced patients to agree to services due to the waiver of co-pay, which was prior to the execution of any assignments. (*Id.* ¶¶ 310–311 ("Prior to assigning benefits, patients were induced to undergo Lap Band procedures with promises that they would not be responsible for their co-payment or other financial responsibility amounts and by failing to disclose that these patient financial responsibility amounts were being improperly waived.")). As such, even assuming that valid assignments would render Providers parties to the contracts—an issue which the Court need not decide at present—the allegations in the FACC support an inference that Providers' interference often took place prior to any assignments, and therefore prior to any time during which Providers would have been parties to the contracts. Though the interference allegations are, in part, qualified with the "in many cases" language cited above, the next sentence (detailing the progression of promises that induced patients to undergo Lap–Band procedures prior to any assignment of benefits) can be read more broadly. As such, the Court finds that United has alleged circumstances indicating interference prior to any arguable presence of Providers in the relevant contractual relationship.

Providers argue that "Exhibit A to the Salazar Declaration ... demonstrates that each example United Member signed multiple written acknowledgements that they would be responsible for their medical bills, *at the same time* that supposed verbal promises were made." (Mot. at 21 (emphasis in original)). United argues in its Opposition that "Providers' claim that they became assignees before the interference involves factual issues inappropriate for resolution on a motion to dismiss." (Opp. at 18 n. 20). The Court agrees and will not resolve such a factual dispute at this early stage.

**c. United as Stranger to the Contracts**

Next, Providers argue that United itself is a stranger to the contracts between the self-funded plans and the plan members and, therefore, cannot recover for alleged interference with these contracts. (Mot. at 21). Neither party cites any authority in support of arguments that United is or is not a stranger to the contracts at issue. However, as discussed at the December 10, 2014 hearing, Providers do not argue that United is not a party to the contracts involving fully-insured plans. As such, the following analysis is only relevant for those pertaining to self-funded plans.

Given that the "stranger" terminology is commonly invoked when determining the appropriate subject of an interference claim—rather than evaluating the propriety of a particular party bringing such a claim—Providers' argument seems more aptly categorized as a question of United's standing to bring an intentional interference claim for a contract to which it is purportedly not a party.

■ There is California authority to support a finding that United is not a stranger to the insurance contracts at issue. *See Mintz v. Blue Cross of California*, 172 Cal.App.4th 1594, 1603, 92 Cal.Rptr.3d 422 (2009) (holding that a claims

administrator was not a stranger to an insurance plan for purposes of an interference claim asserted against it). However, the Court fails to see how United satisfies the elemental requirement that it be an actual party to the contracts with which it asserts interference. Barring a showing that it is in fact a party, United cannot assert an interference claim. For this reason, the interference claim fails as to self-funded plans.

**d. Breach or Disruption of Contractual Relationship**

In light of the statement above regarding self-funded plans, the following analysis is performed merely to determine whether the interference claim may proceed as to fully-insured plans.

The FACC alleges that Providers' promises "caused the United members to violate the terms of their health benefit plans." (FACC ¶ 310). Providers contend that, at most, United has alleged that waiver of co-pay "negated" coverage, which is not a breach. (Mot. at 21). As such, Providers appear to argue that an actual inducement to breach is required for an interference claim.

■ However, as discussed above, a claim for intentional interference requires that an "actual breach *or disruption* of the contract relationship occurred." *Sebastian Int'l, Inc.*, 162 F.Supp.2d at 1203 (emphasis added). In this way, "the expectation that the parties will honor the terms of the contract is protected against officious intermeddlers." *Pac. Gas & Elec. Co. v. Bear Stearns & Co.*, 50 Cal.3d 1118, 1128, 270 Cal.Rptr. 1, 791 P.2d 587 (1990). A party "need not allege an actual or inevitable breach of contract in order to state a claim for disruption of contractual relations." *Id.* at 1129, 270 Cal.Rptr. 1, 791 P.2d 587. A valid claim has been found, for example,

when a party's performance was rendered more costly or burdensome by virtue of the alleged interference. *Id.*

United states that "the United Plans are commonly designed with higher patient-responsibility amounts for out-of-network services. These higher amounts incentivize patients to obtain services on a (less costly) in-network basis, and serve as a check on the higher charges of out-of-network providers, who have not otherwise contracted with United for their rate of reimbursement." (FACC ¶ 4). United further alleges that "[t]o ensure that the United Plans function as intended, the patient-responsibility amounts are typically a predicate to any responsibility of a United Plan to provide coverage for services." (*Id.*). The FACC plausibly alleges, therefore, that as a result of the Counterclaim Defendants' purported conduct in waiving co-pay, United was made to pay more than it would otherwise have done, both because participants were incentivized to use out-of-network providers who charge more than in-network providers, and because United would not have paid at all had it realized that its obligation to do so had been negated by such waivers. Presumably the first of these increased payment rationales would only attach when the reimbursement methodology takes into account the provider's billed charges, but the FACC alleges that this a methodology used by at least some United plans. (*See* FACC ¶ 54). Thus, United's performance was rendered more costly that it otherwise would have been by virtue of the Counterclaim Defendants' purported actions. This is sufficient to demonstrate the requisite interference at this early stage.

#### e. Speculative or Hypothetical Future Damages

Finally, Providers argue that the types of damages alleged by United, specifically "overuse of health plan benefits," do not support a valid interference claim—presumably, based on Providers' cited authority, because they are speculative, hypothetical future damages. (Mot. at 21).

However, United has alleged that it seeks "all damages *incurred* as a result of the Counterclaim Defendants' intentional interference, including (but not limited to) damages in the amount of overuse of health plan benefits resulting from the illegal inducement, as well as damages in the amount of the fraudulent billings." (FACC ¶ 315) (emphasis added). Moreover, the allegations supporting this claim are framed in the past tense. (*See* FACC ¶¶ 310–14). Reading the pleadings in the light most favorable to United, this past-tense request for damages does not request hypothetical future damages, but rather seeks redress for wrongs said to have already occurred based on existing contractual relationships.

#### 5. United's Compliance With Antecedent Procedural Requirements

Providers argue that United's state law claims should be dismissed because United has failed to comply with California Insurance Code sections 10123.13 and 10123.145, which purportedly require certain notifications to a provider if a claim is contested or denied, or if recoupment of overpayments are sought, respectively. (Mot. at 22).

As a preliminary matter, Providers cite to no caselaw interpreting these provisions as imposing a procedural requirement that must be satisfied prior to bringing suit under the facts of this case. Moreover, the text of the statutes themselves render Providers' argument unpersuasive. California Insurance Code section 10123.13 provides, in relevant part:

> *Every insurer* issuing group or individual policies of health insurance that

covers hospital, medical, or surgical expenses, including those telehealth services covered by the insurer as defined in subdivision (a) of Section 2290.5 of the Business and Professions Code, *shall reimburse claims or any portion of any claim, whether in state or out of state, for those expenses as soon as practical, but no later than 30 working days after receipt of the claim by the insurer unless the claim or portion thereof is contested by the insurer, in which case the claimant shall be notified, in writing, that the claim is contested or denied, within 30 working days after receipt of the claim by the insurer.* The notice that a claim is being contested or denied shall identify the portion of the claim that is contested or denied and the specific reasons including for each reason the factual and legal basis known at that time by the insurer for contesting or denying the claim. If the reason is based solely on facts or solely on law, the insurer is required to provide only the factual or the legal basis for its reason for contesting or denying the claim.

Cal. Ins.Code § 10123.13(a) (emphasis added). Assuming that this provision would otherwise be applicable to United in this case, by its plain text, California Insurance Code section 10123.13 applies to an initial benefits determination. This is not the scenario alleged to be at issue in the FACC. Here, the FACC alleges that claims were processed and paid, but that the payments were approved on the basis of "false and misleading claim information." (FACC ¶ 57).

Similarly, California Insurance Code section 10123.145 provides, in relevant part:

*Whenever an insurer* issuing group or individual policies of disability insurance which covers hospital, medical, or surgical expenses *determines that in reimbursing a claim for provider services an institutional or professional provider has been overpaid, and then notifies the provider* in writing through a separate notice identifying the overpayment and the amount of the overpayment, *the provider shall reimburse the insurer within 30 working days of receipt by the provider of the notice of overpayment unless the overpayment or portion thereof is contested by the provider* in which case the insurer shall be notified, in writing, within 30 working days.

Cal. Ins.Code § 10123.145(a) (emphasis added). Assuming that this provision would otherwise be applicable to United in this case, California Insurance Code section 10123.145(a) simply obligates a provider to act if and when it receives notification from an insurer of an overpayment. It contains no language imposing a duty upon the insurer.

As these provisions are facially inapplicable, it is not necessary at present to conduct an analysis of whether they are preempted.

### D. United's ERISA Claims

#### 1. Administrative Exhaustion

Providers contend that United's attempts to recoup overpayments under the plans constitute "adverse benefit determinations" under ERISA, such that United must adhere to the same administrative exhaustion requirements applicable to initial benefit decisions. (Mot. at 2, 22–24).

"ERISA provides notice and appeal rights, to participants and beneficiaries when a plan makes an adverse benefit determination." *Pennsylvania Chiropractic Ass'n v. Blue Cross Blue Shield Ass'n*, 903 F.Supp.2d 604, 611 (N.D.Ill.2012) (citing 29 U.S.C. § 1133; 29 C.F.R.

§ 2560.503–1(a), (g), (h)). An initial benefit denial, for instance, requires written or electronic notice to the claimant describing, *inter alia*, the specific reasons for the adverse determination. 29 C.F.R. § 2560.503–1(g). Plans are also required to "establish and maintain a procedure by which a claimant shall have a reasonable opportunity to appeal an adverse benefit determination to an appropriate named fiduciary of the plan, and under which there will be a full and fair review of the claim and the adverse benefit determination." 29 C.F.R. § 2560.503–1(h)(1).

▉ As a general rule, prior to bringing an ERISA claim in federal court, a plaintiff must exhaust administrative remedies under the relevant benefit plan. *Diaz v. United Agr. Emp. Welfare Benefit Plan and Trust*, 50 F.3d 1478, 1483 (9th Cir.1995). "Although not explicitly set out in the statute, the exhaustion doctrine is consistent with ERISA's background, structure and legislative history and serves several important policy considerations, including the reduction of frivolous litigation, the promotion of consistent treatment of claims, the provision of a nonadversarial method of claims settlement, the minimization of costs of claim settlement and a proper reliance on administrative expertise." *Id.* (citing *Amato v. Bernard*, 618 F.2d 559, 566–68 (9th Cir.1980)). "[F]ederal courts have the authority to enforce the exhaustion requirement in suits under ERISA, and that as a matter of sound policy they should usually do so." *Amato*, 618 F.2d at 568.

There is, however, a distinction between claims that only allege violations of the terms of ERISA statutes (which do not require exhaustion), and claims that necessitate in inquiry into the parties' rights and duties under a plan (which do). *See Graphic Commc'ns Union, Dist. Council No. 2, AFL–CIO v. GCIU–Employer Ret.*

*Ben. Plan,* 917 F.2d 1184, 1187 (9th Cir. 1990) ("On the one hand, '[e]xhaustion of internal dispute procedures is not required where the issue is whether a violation of the terms or provisions of the statute has occurred.' ... On the other hand, exhaustion ... is ordinarily required where an action seeks 'a declaration of the parties' rights and duties under [a plan].' " (internal quotation marks and citations omitted)). *See also Diaz,* 50 F.3d at 1483 (discussing the limits of this distinction).

Providers' out-of-circuit authority does suggest that recoupment of overpayments could constitute an adverse benefit determination under ERISA under certain circumstances. *See, e.g., Premier Health Ctr., P.C. v. UnitedHealth Grp. ("Premier Health"),* 292 F.R.D. 204, 222–23 (D.N.J. 2013) (discussing recoupment letters in the context of adverse benefit determinations); Brief for the Secretary of Labor as Amicus Curiae, *Tri3 Enters., LLC v. Aetna, Inc.* (3d Cir. Nov. 30, 2012) (discussing recoupment effort by Aetna as a denial of coverage, constituting an adverse benefits determination that triggered ERISA's appeal procedures); *Pennsylvania Chiropractic Ass'n,* 903 F.Supp.2d at 613–14 (discussing how "reasonable fact finder[s]" could conclude that specific repayment demands were adverse benefit determinations under the applicable regulations). Several cases also discuss the notice and appeal rights that follow from such an adverse benefits determination. *See, e.g., Pennsylvania Chiropractic Ass'n,* 903 F.Supp.2d at 614–15 (holding that, following a repayment demand that could be characterized as an adverse benefit determination, "a reasonable fact finder could conclude that [one of the plaintiffs at issue] never received ERISA-compliant notice and appeal").

▉ Even so—and setting aside antecedent requirement that Providers qualify as a participant or beneficiary for purposes

of receiving notice and appeal rights—none of Providers' cited authority stands for the proposition that, in a suit such as this, a fiduciary must exhaust administrative remedies before it is entitled to recoup equitable relief on behalf of the plan under ERISA § 502(a)(3). Rather, these cases involve providers bringing suit against insurers/administrators in the context of the insurers' attempts to recover overpayments and fail to mention administrative exhaustion except as pertains to an insurer attempting to invoke administrative exhaustion against providers, a scenario not presently before the Court. *See, e.g., Premier Health,* 292 F.R.D. at 226; *Pennsylvania Chiropractic Association v. Blue Cross Blue Shield Association,* 4 F.Supp.3d 929, 950 (N.D.Ill.2013).

Absent a showing that, under the facts of this case, ERISA contemplated the imposition of this administrative hurdle before a plan fiduciary may institute suit to redress purported violations of plan terms, the Court declines to require it here.

### 2. Damages Under § 502(a)(3)

Providers assert that § 502(a)(3) damages are not available to United because fiduciaries are not entitled to damages under this section, and, even if proper equitable relief is sought, United's allegations that the overpayments are still in Providers' "possession, custody, or control" are "ludicrous." (Mot. at 24–25).

#### a. Equitable and Legal Relief

Pursuant to § 502(a)(3), "a plaintiff who is a 'participant, beneficiary, or fiduciary' must prove both (1) that there is a remediable wrong, *i.e.,* that the plaintiff seeks relief to redress a violation of ERISA or the terms of a plan; and (2) that the relief sought is 'appropriate equitable relief'...." *Gabriel,* 773 F.3d at 954 (citations omitted). It is true, therefore, that in a claim brought under § 502(a)(3), "[t]he complaining party must seek 'equitable, rather than legal relief.'" *Paulsen,* 559 F.3d at 1075 (quoting *Reynolds Metals Co. v. Ellis,* 202 F.3d 1246, 1247 (9th Cir. 2000)). "In assessing whether a claim for 'equitable' relief has been properly brought under ERISA, we look to the 'substance of the remedy sought . . . rather than the label placed on that remedy.'" *Id.* (quoting *Mathews v. Chevron Corp.,* 362 F.3d 1172, 1185 (9th Cir.2004)).

In *Sereboff v. Mid Atlantic Medical Services, Inc. ("Sereboff"),* 547 U.S. 356, 363–65, 126 S.Ct. 1869, 164 L.Ed.2d 612 (2006), the Supreme Court discussed that equitable relief pursuant to ERISA § 502(a)(3) can include the imposition of an equitable lien or constructive trust over assets alleged to have been wrongfully transferred. The Court noted that § 502(a)(3)(B) had been interpreted to allow only "'those categories of relief that were typically available in equity.'" *Id.* at 361, 126 S.Ct. 1869 (quoting *Mertens v. Hewitt Assocs.,* 508 U.S. 248, 256, 113 S.Ct. 2063, 124 L.Ed.2d 161 (1993)). The Court also discussed its prior opinion *Great–West Life & Annuity Ins. Co. v. Knudson ("Knudson"),* 534 U.S. 204, 122 S.Ct. 708, 151 L.Ed.2d 635 (2002), in which it noted that "'not all relief falling under the rubric of restitution [was] available in equity.'" *Id.* (quoting *Knudson,* 534 U.S. at 212, 122 S.Ct. 708). Rather, in *Knudson,* the Court evaluated what would have been done in the days of a divided bench, stating that "for restitution to lie in equity, the action generally must seek not to impose personal liability on the defendant, but to restore to the plaintiff particular funds or property in the defendant's possession." *Knudson,* 534 U.S. at 212–14, 122 S.Ct. 708. The *Sereboff* Court also distinguished between the tracing rules required for equitable lien by agreement as opposed to equitable restitution, with the latter traditionally requiring a claimant to trace the property back to its own posses-

sion. *Sereboff*, 547 U.S. at 364–65, 126 S.Ct. 1869; *see also Bilyeu v. Morgan Stanley Long Term Disability Plan*, 683 F.3d 1083, 1092 (9th Cir.2012), *cert. denied sub nom. First Unum Life Ins. Co. v. Bilyeu*, —— U.S. ——, 133 S.Ct. 1242, 185 L.Ed.2d 178 (2013). Ultimately, *Sereboff* found that the relief Mid Atlantic Medical Services, Inc. sought—certain funds recovered in a tort settlement and set aside in an investment fund—were properly classified as equitable. *Sereboff*, 547 U.S. at 369, 126 S.Ct. 1869.

### b. *Bilyeu* and Equitable Lien by Agreement

■ In *Bilyeu*, the Ninth Circuit applied *Sereboff* and *Knudson* in the context of an ERISA 502(a)(3) claim, and distinguished between the equitable recovery of specific funds in a defendant's possession and the legal remedy of damages recovered from general assets. *Bilyeu*, 683 F.3d at 1093–94. Because ERISA § 502(a)(3) allows only for equitable relief, the Ninth Circuit held that tracing of specific assets is necessary in order to validate the propriety of relief sought. *Id.* at 1094–97. However, the *Bilyeu* court also noted that the recovery of equitable relief is not foreclosed merely because the funds sought have been "commingled ... with the defendant's other assets or exchanged ... for other property." *Id.* at 1096 n. 6. Rather, in order to secure an "equitable lien by agreement in an ERISA action," a plaintiff must demonstrate: (1) "a promise by the beneficiary to reimburse the fiduciary for benefits paid under the plan in the event of a recovery from a third party"; (2) that the reimbursement is of a specifically identified fund; and (3) that the funds identified are still in the defendant's possession and control. *Id.* at 1093–94 (citing *Sereboff*, 547 U.S. at 363–64, 126 S.Ct. 1869).

Both Providers and United appear to agree that the *Bilyeu* test for equitable lien by agreement frames the relevant inquiries here. (*See* Opp. at 23–24; Reply at 12–14). Presumably, this is linked to the allegation in the FACC that the Counterclaim Defendants, "by knowingly accepting payments from the Plan, ... became bound by the Plan's terms and conditions, including conditions related to overpayments." (FACC ¶ 328). United alleges that "[t]he ERISA Plans in question typically include language requiring that any overpayments that are made ... must be returned," which, when coupled with the prior allegations, would suggest satisfaction of the first *Bilyeu* prong. (FACC ¶ 323). This would appear to be particularly true in instances involving valid assignments. In situations lacking assignments, the issue becomes more difficult. However, as the parties have disputed primarily the second and third prongs of the *Bilyeu* test, the Court need not analyze at present to what extent claims not involving valid assignments might nevertheless fall within the equitable lien by agreement analysis.

As to the second prong, United alleges that the specific funds it seeks are the overpayments received through fraud. (FACC ¶ 333). Providers argue that the type of relief requested here, even if the dollar amounts are specific, is not traceable to a sufficiently specific fund to satisfy *Bilyeu*'s second criterion. (Reply at 12–13). In *Bilyeu*, the Ninth Circuit expressed doubt as to whether the case before it, involving recovery of overpayments pursuant to a contractual reimbursement clause, satisfied this second prong. 683 F.3d at 1093–94. There, a claim administrator argued that once the plan participant received a third-party recovery (Social Security disability benefits), a specifically identifiable fund (overpaid disability benefits under the plan)

came into existence and an equitable lien over the fund was appropriate. *Id.* at 1093. The Ninth Circuit found this characterization "plausible, but problematic," and distinguished the tort recovery in *Sereboff,* noting that the overpaid benefits, unlike the tort recovery, were "not a particular fund, but a specific amount of money encompassed *within* a particular fund." *Id.* (emphasis in original). The court went on to note that the reimbursement agreement would have skirted these same issues if it had identified the third party recovery, rather than the overpayments, as the fund from which reimbursement would be sought; though, this was not feasible in *Bilyeu* because the third-party recovery consisted of Social Security benefits, which are unalienable. *Id.* at 1093–94. Ultimately, the *Bilyeu* court stated that "[e]ven assuming" the second criterion of the test could be satisfied in that case, the third could not. *Id.* at 1094.

 Although *Bilyeu* is not absolute in its pronouncement that recovery of overpayments, as in the situation before the Court, could never meet the second prong of the test, the Ninth Circuit's analysis does lend that impression. *See Bilyeu,* 683 F.3d at 1093 ("As an amount of money, the overpayment is specific. As property or as a fund, however, the overpayment is lacking in specificity because it is an undifferentiated component of a larger fund."). As a result, under controlling Ninth Circuit authority, the Court concludes that in situations where United is seeking to recover simply the overpayment portion of a benefit distribution made, United has failed to meet the second prong of the *Bilyeu* test. Consequently, the Court need not reach the third prong for these claims.

However, United not only seeks overpayments as part of a distribution; United also seeks, in many instances, the entire payment made to Providers on the basis that the purported misrepresentations rendered *any* payment improper under the terms of the plans. (*See* FACC ¶ 5 ("The Counterclaim Defendants promised patients on a routine basis that they would waive patient-responsibility amounts and accept, as payment in full, whatever amount would be paid under their health plan, thereby removing the patient's financial incentive to ensure the care is medically appropriate, necessary, and cost-effective. The Counterclaim Defendants did not disclose these routine waivers to United and, instead, submitted falsified claim forms that overstated the total charges for the procedure by, among other things, including the patient-responsibility amounts as charges, even though the patients would not be charged. As a direct result of—and in justifiable reliance upon—this false billing, United was induced to approve claims for payment under the United Plans totaling many millions of dollars when, in reality, such claims were not covered."); *see also id.* ¶ 329 ("Among other things, United seeks restitution in the total amount of the payments made to Counterclaim Defendants on behalf of patients to whom the Counterclaim Defendants promised that they would waive any Member Responsibility Amounts.")). In such a situation, the problem faced with an overpayment component of a benefit distribution is seemingly no longer present. Now the recovery sought is no longer an "undifferentiated component of a larger fund," but rather the entire payment made to Providers.

 Moving on to the third *Bilyeu* prong for just these "entire payment" claims, United alleges that the funds it seeks have been deposited into bank accounts identified by United (FACC ¶¶ 330–31), that some or all of the overpayments sought as equitable relief are still in these

accounts (*id.* ¶ 332), and that even if some portion of these payments were removed from the identified accounts, the same sums are still in "other bank accounts within the possession, custody, and control of the Counterclaim Defendants" (*id.* ¶ 332). At this early stage, United's allegations are sufficient to satisfy the third *Bilyeu* prong.

Consequently, the Court finds that United has failed to adequately allege a claim for equitable restitution pursuant to § 502(a)(3) for claims seeking the overpayment portion of a benefits distribution. To the extent that other relief in United's § 502(a)(3) claims are merely claims for this same restitution re-framed as other types of equitable relief, such relief is similarly unavailable. However, United has made sufficient allegations to state a claim for restitution of entire payments erroneously made to Providers.

### 3. United's Position and Anti–Assignment Clauses

Providers finally argue that United cannot take contrary positions as to the import of Providers' assignments in this case and the related *Almont* case, No. CV 1402139. (Mot. at 25). Providers contend that United can only bring its fifth and sixth claims if the assignments are valid, and indicate that there must have been assignments here because, unlike assignees, authorized representatives are not entitled to payment. (*Id.* at 25–26).

As a preliminary matter, the FACC explicitly alleges that United invokes only "valid" assignments in connection with its § 502(a)(3) claims. (FACC ¶ 328). This would, by necessity, exclude invocation of assignments that were void due to anti-assignment provisions or other defects. Any purportedly contrary language used in the Counterclaim has been superseded by the FACC and is not properly considered in deciding this Motion. *See Ferdik*

*v. Bonzelet*, 963 F.2d 1258, 1262 (9th Cir. 1992), *as amended* (May 22, 1992) ("[A]fter amendment the original pleading no longer performs any function and is 'treated thereafter as non-existent' .... ") (citations omitted).

Furthermore, at present, the Court is not in a position to gauge the actual overlap on this anti-assignment issue between the two cases. The mere fact that there may be overlap between the entities at issue in this and the related *Almont* action does nothing to confirm, for example, that the terms of the relevant plans were the same for any particular claims. In sum, at this early stage in the proceedings, the Court does not possess sufficient information to categorically preclude United from asserting this ERISA theory of recovery.

Finally, Providers cite to no caselaw for their apparent assertion that "authorized representatives" are not entitled to payment under any circumstances. (Mot. at 26). Recently, the Ninth Circuit held that United had not waived its right to assert a plan's anti-assignment provision, despite having failed to raise it during the first level appeal process, when the plan allowed the claims administrator to pay a provider directly for services rendered. *Spinedex Physical Therapy USA Inc. v. United Healthcare of Arizona, Inc.*, 770 F.3d 1282, 1296–97 (9th Cir.2014). The Ninth Circuit held that "there is no evidence that United was aware, or should have been aware, during the administrative process that [the provider] was acting as its patients' assignee. So far as United knew, [the provider] was acting merely as an authorized representative charged with filing, collecting, or appealing a claim on behalf of the patient." *Id.* at 1297. The fact that United could have been paying the provider, yet not known that it was operating as an assignee, forecloses the argument that an authorized representa-

tive can never be entitled to payment without operating as an assignee.

## III. *CONCLUSION*

In sum, the Motion is **GRANTED** with regard to dismissal of the UCL claims United brings on behalf of self-funded plans, any of United's claims that manifestly fall outside of the applicable statute of limitations from the face of the FACC, United's intentional interference claim asserted relative to self-funded plans, United's fraud claim, United's conspiracy claim, and United's ERISA claims to the extent they seek restitutionary relief in the form of overpayment portions of benefit disbursements. As to all other matters, the Motion is **DENIED**. The Court notes that, while United's UCL claim is deficient as to the allegations that sound in fraud, United does adequately allege certain "unlawful" activity and, therefore, pleads a cognizable UCL claim.

To the extent that the Motion is granted, the Court permits leave to amend.

Therefore, United may file a Second Amended Counterclaim ("SACC") on or before **March 30, 2015**. If United files a SACC, Providers shall file an answer or motion to dismiss on or before **April 20, 2015**. If Providers choose to file a motion to dismiss, they must meet and confer with United at least **5 days** before the motion is filed.

The hearing on any motion to dismiss the SACC will take place on **June 1, 2014**.

IT IS SO ORDERED.